

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-21-1998

# United States v. Haddy

Precedential or Non-Precedential:

Docket 96-5589

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Haddy" (1998). *1998 Decisions*. Paper 18.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/18

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 21, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5589 and 96-5622

UNITED STATES OF AMERICA

v.

BRAD HADDY, a/k/a Bradley J. Haddy

Brad Haddy,

   Appellant in No. 96-5589

(D.C. Crim. No. 93-cr-00558-3)

UNITED STATES OF AMERICA

v.

ERIC WYNN,

   Appellant in No. 96-5622

(D.C. Crim. No. 93-cr-00558-1)

Appeal from the United States District Court
for the District of New Jersey

Argued October 20, 1997

Before: MANSMANN and GREENBERG, Circuit Judges,
and ALARCON, Circuit Judge.*

(Opinion filed January 21, 1998)

_____

*Honorable Arthur L. Alarcon of the United States Court of Appeals for
the Ninth Circuit, sitting by designation.

David M. Rosenfield (ARGUED)
Special Assistant U.S. Attorney
Kevin McNulty
Assistant U.S. Attorney
Amy S. Winkelman (ARGUED)
Assistant U.S. Attorney
Faith S. Hochberg
U.S. Attorney
Office of United States Attorney
970 Broad Street
Room 502
Newark, NJ 07102

 COUNSEL FOR APPELLEE

Robert A. Brunig, Esquire (ARGUED)
Moss & Barnett
90 South 7th Street
4700 Norwest Center
Minneapolis, MN 55402

 COUNSEL FOR APPELLANT IN
 NO. 96-5589

Alan Dexter Bowman, Esquire
 (ARGUED)
Alan Dexter Bowman, PA.
Raymond A. Brown, Esquire
Brown & Brown, P.C.
Gateway I
Suite 105
Newark, NJ 07102

 COUNSEL FOR APPELLANT IN
 NO. 96-5622

2

OPINION OF THE COURT

MANSMANN, Circuit Judge.

Eric Wynn and Brad Haddy appeal from judgments in criminal cases entered by the District of New Jersey after a jury found them guilty of conspiracy to commit securities fraud and of substantive crimes relating to manipulation of the stock market. Wynn was also convicted of wire fraud. After sentencing, Wynn and Haddy appealed, raising a number of assertions of error. Two questions -- whether the indictment contained duplicitous counts and whether investor reliance is a requisite of proof to convict under section 10(b) of the Securities Act of 1934 -- require discussion. Several other issues, involving constructive amendment of the indictment, statute of limitations, severance, willfulness as an element of the securities law violation, character evidence of a witness, prosecutorial misconduct, admission of evidence, jury instructions, competency and sentencing, are without merit and do not warrant further discussion.1

_____

1. In his brief, Haddy set forth these additional issues as:

> 1. The government failed to prove that he acted willfully, an essential element of the crimes of securities fraud and conspiracy to commit securities fraud;

> 2. His right to a fair trial was prejudiced by the district court's denial of his motion for a separate trial;

> 3. Prosecutorial misconduct, consisting of the unauthorized use of a grand jury subpoena, offering testimony known to be untrue, lack of a "good faith basis" for asking certain questions of a witness, making baseless arguments that certain assumptions were "incorrect and incomplete" or "misleading," offering a misleading summary chart, and interfering with his attempts to interview witnesses, prejudiced him and required a mistrial;

> 4. The district court erred in excluding testimony by opinion witnesses who would impeach the credibility of a principal witness for the prosecution and thus denied him his Sixth Amendment right to compulsory process;

3

We will affirm the judgments entered. We concludefirst,
that the indictment does not suffer from the vice of
duplicity. The relevant statutory and regulatory language
allow charging an overall scheme to defraud in a single
count of an indictment. Second, criminal liability under
section 10(b) of the Securities Exchange Act does not
require deception of and reliance by an identifiable buyer or

_____

5. The district court erred by admitting financial records obtained
pursuant to grand jury subpoena in direct contravention of the
Right to Financial Privacy Act;

6. The district court erred by admitting into evidence recordings of
intercepted wire communications and evidence derived from these
communications;

7. The government failed to apply for or obtain authorization or
approval to use or disclose the contents of the intercepted wire
communications before the grand jury;

8. The district court erred in refusing to instruct the jury concerning
the time at which a sale of a security is deemed complete, venue,
legal responsibility, and the need for showing deception and investor
reliance; and erred in charging the jury that it might return a
verdict of guilty as to Count I (or Counts II, III and IV) without
finding unanimously that one of the overt acts charged in the
indictment occurred during the limitation period; and,

9. The district court erred in sentencing him by not reducing his
sentence to take into consideration that conspiracy is a "lesser
included offense" of the continuing criminal enterprise and by
incorrectly using the "gross gain secured by the conspiracy as a
whole, [by] the co-conspirators and those persons and accounts
which they controlled" to compute the amount of loss.

In Wynn's brief, these issues are described as:

1. The district court erred in permitting the government to
constructively amend the indictment by altering the theory of the
government presented to the grand jury that Wynn's conduct was
per se unlawful, to an urging before the petit jury that he engaged
in lawful activity with a corrupt and manipulative intent; and,

2. The district court erred in determining that the government met
its burden of proving Wynn's mental competency by concluding that
the panic disorder suffered by him did not render him unable to
assist in his defense.

seller of securities. The statute's objective of maintaining the integrity of the stock market forbids deceitful practices without mention of whether investors relied upon the manipulative devices in connection with a securities transaction.

Our jurisdiction is granted by 28 U.S.C. S 1291.

I.

We review the facts in a light favorable to the government, the verdict winner.

A. The Scheme

In approximately 1987, Eric Wynn and Barry Davis formed a company called Princeton Financial Consultants to raise capital for companies and to promote stocks. Through this entity, Wynn and Davis masterminded and directed a number of securities trading scams by designing a plan to artificially raise the prices of particular securities, known as penny stocks. Penny stocks, generally valued at under $5.00 a share, are traded on the over-the-counter market through the National Association of Securities Dealers Automated Quotation system (NASDAQ).

Princeton employees called on brokers and traders throughout the country touting different stocks. The participation of collaborating stockbrokers was essential to the effectiveness of the scheme. One of the brokers who followed the Princeton/Wynn recommendations was Brad Haddy, who sold securities through the Minneapolis brokerage firm of L'Argent Securities.

The manipulation involved four basic steps: (1) control the quantity of stock available for trading; (2) generate demand for the stock; (3) raise the price of the stock; and (4) sell out at a large profit.

Control of the supply of securities was gained by "boxing" the initial public offerings ("IPOs") of securities in particular companies. Boxing refers to an allocation of almost all of the available stock to accounts controlled by "players" -- those who had agreed to trade the stock per the direction

5

of Wynn. One directive required that when the after-trading market commenced -- the public trading that occurs after the close of the IPO -- the players could not sell the stock until Wynn gave the go-ahead. With this restriction, Wynn was able to control the supply of stock which, in turn, enabled him to regulate the price of the stock.

Step two, generation of demand, was primarily accomplished through bribery of brokers. Colluding brokers sold securities to their customers at prices and from brokerage firms designated by Wynn. The brokers were then instructed to hold the particular stock off the market for a period of time (usually six months). In exchange, the brokers received various inducements, including cash, stock below the market price, guaranteed profits and promises of participation in future deals. Another way Wynn created demand for a particular stock was by secretly advising brokers of impending mergers of certain companies before public announcement of the event.

The next step, the price increase, was realized through pre-arranged and restricted trading in which selected brokers bought stock at steadily increasing prices -- again, as directed by Wynn.

Once the price of the manipulated securities rose to certain levels, the inflated value was maintained through deals with "market maker" brokerage firms. These firms represent themselves to the investing public as being willing to sell and trade risky securities. Wynn induced certain market makers to set their buy (bid) and sell (ask) for some securities at prices in accordance with his instructions in exchange for guaranteed trading profits. By manufacturing a demand for these securities, the participants insured their personal profits occasioned by transactions in these securities.

The manipulations detailed in the indictment concern the use of the services of Sheffield Securities, a brokerage firm in Fort Lauderdale, Florida. Sheffield was run by Ronald Martini, who, despite being barred from participation in the securities business, was a secret owner of Sheffield. Wynn entered into an agreement with the principals of Sheffield which allowed him to dominate the initial public offerings of

6

stocks in certain shell companies underwritten by Sheffield. Wynn would also be permitted to direct the after market trading in these particular securities.

Three security offerings in particular epitomize the scope of the illegal activity and are the subjects of counts 2, 3 and 4 of the indictment.

B. Count 2 – Vista Capital Corp.

The first stock that Wynn and Davis manipulated through Sheffield was Vista Capital Corporation, a company engaged in an IPO. In filings with the Securities and Exchange Commission, Vista was represented as a blind pool, a company with no actual or anticipated business operations. Vista's status was, however, misrepresented. During the period of the IPO, Wynn arranged for a merger between Vista and a film company called Bima Entertainment.

Wynn's plan was to raise money for Vista through an offering of its stock, as a result of which Vista would become a public company. Wynn would then trade Vista securities on the OTC market in a manner that would insure that the price of Vista would rise, enabling the players to make a substantial amount of money. As planned, the price of Vista rose $.11 per share within the first month of aftermarket trading.

In line with the four-step design, Wynn controlled the supply of Vista stock by boxing the Vista IPO -- allocating the securities issued to accounts set up at Sheffield. Although the Vista prospectus stated that Sheffield, the underwriter, would make the final decisions concerning stock distribution during the IPO, it was actually Wynn who directed the specifics of the offering. When investors outside Wynn's affiliations requested Vista stock, they were denied the opportunity to participate in the trading. Wynn was able to regulate the trading in the Vista IPO stock partly because Sheffield maintained control over the actual Vista stock certificates. If a "non-playing" customer tried to have Vista stock transferred and sold, Sheffield's clearing agent would so advise Sheffield, who passed on the information to Wynn. The only stock certificate transfers that Sheffield

7

authorized the clearing agent to effectuate were those allocated to accounts associated with Wynn.

Wynn generated the demand for the Vista stock by offering inducements or bribes to brokers to have their customers buy the stock. One broker, John Marsala, testified that Wynn asked him to have his customers buy Vista stock and hold it off the market. In return, Marsala was offered 100,000 Vista warrants[2] for himself. Although he opted out of participation, he observed another broker putting a stock certificate into his briefcase. Wynn advised Marsala that what he witnessed was a broker receiving the same warrants that had been promised to Marsala if he had participated in the Vista deal.

Bribes were not the only means by which Wynn induced brokers to buy Vista stock. He also encouraged participation by offering non-public inside information. In the case of Vista, brokers, including Haddy, were told that the company would be merging prior to the close of the IPO. Wynn was able to represent the Vista/Bima merger as a certainty because he had arranged the merger through his consulting company, Skyline Capital Corp.

Although the Vista/Bima merger was arranged before the close of the Vista IPO, the Vista prospectus was not timely amended to disclose the information. An expert for the SEC testified that if a blind pool company finds a probable merger candidate before the close of its IPO, the company must stop distributing its securities and file a post-effective amendment with the SEC. Notice to the agency is required because a potential merger would amount to a fundamental change affecting decisions of investors.

Wynn, Davis and Haddy and other players eventually sold their Vista stock at a large profit.

C. Count III – Castleton Investors Corp.

The second stock manipulated through Wynn's control of Sheffield was Castleton Investors Corp., another shell

---

2. A warrant is a right to acquire stock at a defined future time and at a specified price.

company. Castleton became a public company through an IPO underwritten by Sheffield in 1986. In late June, 1988, Wynn was advised that a security guard anti-terrorism business owned by G. Gordon Liddy[3] wanted to merge with Castleton. Sheffield expressed its willingness to sell Liddy a majority of the free-trading Castleton stock currently owned by Sheffield customers.

Wynn took over the helm of the Liddy deal. His consulting company, Skyline, entered into an agreement with Liddy for a 30-day exclusive right to find a merger candidate for the Liddy company.

Once Wynn lined up the expected merger of Castleton and Liddy, he and his coconspirators began manipulating the price of stock using the familiar four step process. About 80% of the free-trading stock was acquired by the "players" from Sheffield customers who were not told of the merger.

Haddy was among the brokers promised Castleton stock in exchange for agreeing to have his customers buy a large block of the stock. Two days after a tape-recorded conversation in which Wynn assured Haddy that he would receive stock, Haddy and his L'Argent customers bought 500,000 shares of Castleton common stock.

Demand for Castleton stock was then created by publicizing the intended merger between the company and Liddy. The announcement resulted in additional buying. Sheffield, acting in accordance with Wynn's instructions as to bid and ask prices, then traded the stock in conformity with the previously arranged deals. Profits were thus guaranteed.

D. Count IV – Bellatrix Corp.

Count IV charged a manipulation scheme involving securities from the Bellatrix Corporation, also a blind pool company engaged in an IPO underwritten by Sheffield. The pattern in the Bellatrix trading mirrored that of the Vista

_____

3. There is no suggestion that Liddy was in any way involved in wrongdoing.

9

stock manipulation –– "box" the IPO, manufacture demand, raise the price through controlled trading, and sell out at a profit. Similarly, the fact of Bellatrix' impending merger with Gamenet, a computer company, was not disclosed to the SEC.

The Bellatrix manipulation was interrupted on the second day of after market trading when the FBI executed search warrants at Wynn's home and, on the next day, at the offices of Sheffield Securities.

E. The Prosecution

On November 15, 1993, a federal grand jury in the District of New Jersey returned an indictment charging Eric Wynn, Brad Haddy, Anthony Nandino, Irwin Frankel and Perry Constantinou with conspiracy to commit securities fraud contrary to 15 U.S.C. S S 77q(a) and 77x (Securities Act of 1933) and 15 U.S.C. S S 78j(b) (section 10(b)) and 78ff (Securities Exchange Act of 1934) and 17 C.F.R. S 240.10b–5 (Rule 10b–5) in violation of 18 U.S.C. S 371 (Count I); and, with execution of schemes to defraud in connection with transactions in three different securities (Counts II through IV). Wynn was charged in nine additional wire fraud counts.

After a six–month trial, the jury returned guilty verdicts against Wynn and Haddy on all charges.4  Post–trial motions were denied.5 Haddy was sentenced to 27 months'

_____

4. The jury found Nandino not guilty on Count IV but could not reach a verdict on the remaining counts. Constantinou was acquitted of all charges against him. Frankel pled guilty prior to trial.

Other coconspirators, Barry Davis, Ronald Martini, John LaSala, Allen Weinstein, Ronald Spencer, Douglas Selander, Frank Grillo, and John Marsala, entered cooperating plea agreements, prior to trial, to informations stemming from the same investigation.

5. Prior to sentencing, Wynn requested a competency hearing nunc pro tunc, alleging that he had suffered from a mental disability which had prevented him from fully participating in his trial. At the government's request, the district court appointed a psychiatrist to examine Wynn. The district court then conducted a competency hearing with testimony from the court–appointed psychiatrist and from the psychiatrist who had

10

imprisonment and ordered to pay a special assessment of $200. Wynn was sentenced to 52 months' imprisonment, followed by three years of supervised release. A $50,000 fine was also imposed on Wynn.

II.

We first address whether Counts II, III and IV of the indictment, charging manipulation of the stocks of each of the three public shell companies, were duplicitous. This is a legal question requiring plenary review. United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989).

The indictment charged Wynn and Haddy with engaging in a fraudulent scheme to design to manipulate the price of Vista (Count II), Castleton (Count III) and Bellatrix (Count IV) securities.6 Wynn and Haddy contend that each individual transaction relating to the individual securities should have been charged in a separate count. Charging an

_____

treated Wynn during trial. After the hearing and argument, the district court denied Wynn's motion to be declared incompetent nunc pro tunc. The court also denied accompanying motions for a new trial based on Wynn's alleged incompetence and additional post-trial motions brought by both defendants.

6. The relevant portion of Count II reads:

> From at least as early as in or about January 1988, to at least as late as in or about December, 1988, in the District of New Jersey and elsewhere, the defendants Eric Wynn . . . Brad Haddy . . . and others . . . knowingly and willfully employed a scheme to defraud in
> connection with the purchase and sale of Vista Securities, through the use of means and instrumentalities of interstate commerce and of the mails, in that they took actions designed to manipulate the price of Vista Securities, all as set forth in Count I of this indictment.

> In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of
> Federal Regulations, Section 240.10b-5.

Counts III and IV were identical except in the identification of the particular security and dates involved. The stock manipulation related to Castleton (Count III) and Bellatrix (Count IV) occurred between June and December of 1988.

11

overall scheme, they argue, renders the indictment faulty because of its duplicity.

Duplicity is the improper joining of distinct and separate offenses in a single count. United States v. Starks, 515 F.2d 112, 116 (3d Cir. 1975). Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial, evidentiary rulings, id. at 116–17, or endanger fair sentencing. United States v. Shorter, 809 F.2d 54, 58 n.1 (D.C. Cir. 1987).

We must ascertain the allowable unit of prosection to decide if the counts of the indictment properly charge a violation of the pertinent statute. United States v. Amick, 439 F.2d 351, 359 (7th Cir. 1971), see also United States v. Pollen, 978 F.2d 78, 85 (3d Cir. 1992) (multiplicity[7] case holding that indictment must follow statute creating offense). Congressional intent dictates the proper unit of prosecution. United States v. Cooper, 966 F.2d 936, 942 (5th Cir. 1992).

The starting point in determining the intent of Congress is, of course, the language of the statute. 15 U.S.C. S 78j(b), commonly known as section 10(b), by its title, proscribes employment of manipulative deceptive devices in connection with securities transactions. The section reads:

> S 78j. Manipulative and deceptive devices.
>
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --
>
> ***
>
> (b) to use or employ, in any connection with the purchase or sale of any security registered on the national securities exchange or any security not so

_____

7. Indictments charging a single offense in different counts are multiplicitous. Multiplicity may result in multiple sentences for a single offense in violation of double jeopardy, or otherwise prejudice the defendant. United States v. Cooper, 966 F.2d 936, 942 n.9 (5th Cir. 1992).

12

> registered, any manipulative or deceptive device or
> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for
> the protection of investors.

15 U.S.C. S 78j(b).

Under the authority of this section, the SEC promulgated Rule 10b-5 to execute enforcement of section 10(b). The regulation makes it unlawful for any person, in connection with the purchase or sale of security, to (1) employ a device, scheme or artifice to defraud; (2) make any false statement of material fact; or, (3) engage in any act, practice or course of business that operates as fraud or deceit upon any person. The clear wording of the statute and the rule thus emphasize the use of manipulative devices in describing the offense. The phrase "in connection with the purchase or sale of securities" positions the illegal activity within the framework of the Securities Exchange Act; it does not describe the prohibited conduct.

The Supreme Court has interpreted section 10(b) and Rule 10b-5 expansively in accordance with its view of Congress' intent in enacting the 1934 Act as a vehicle to minimize fraud in securities trading. As the Court stated in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972), "These proscriptions, by statute and rule, are broad and, . . . obviously meant to be inclusive." The legislation is construed " `flexibly to effectuate its remedial purpose,' " id. (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)), not "technically and restrictively." Id.

The particular counts of the indictment before us track the statutory and regulatory language. They describe the manipulative implementation of a securities trading scheme, the precise activity described in the statute and the implementing rule as illegal. Here, the device was a four-part scheme in which the buying and selling of securities was a segment. Without the boxing, the generation of demand, the contrived rise of the price and the sale at the profit, however, any particular transaction might not be unlawful. Rather, the purchase or sale was intended to further the manipulation of the stock price.

13

We thus conclude that the individual purchase or sale was not the appropriate unit of prosecution here; these retail events were only a step in the advancement of the scheme as a whole. On the facts here, each count properly charged a manipulation of the securities of each of the three separate companies -- each involving a discrete scheme.

In resolving this issue, we decline to dictate an inflexible rule regarding the allowable unit of prosecution in a securities fraud case. The Federal Rules of Criminal Procedure require that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Here, the offenses charged were schemes designed to manipulate the prices of securities. It may be that other violations of the securities laws would lend themselves to a differently enumerated indictment. For example, in a multiplicity case, United States v. Langford, 946 F.2d 798 (11th Cir. 1991), the issue was whether the use of multiple mailings in furtherance of a conspiracy to commit securities fraud in violation of section 10(b) and Rule 10b-5 could form the basis of separate counts of an indictment. The Court of Appeals for the Eleventh Circuit decided that it could not. In so concluding, the Eleventh Circuit recognized that the allowable unit of prosecution under section 10(b) is the use of a manipulative device or contrivance. Id. at 803. The court decided, however, that the overall scheme need not be charged in a single count. Instead, any false statement in connection with a discrete sale can be considered an appropriate unit of prosecution. Id. Langford does not mandate, however, that each sale must form the basis of a count of the indictment. Rather, it clarified that in addition to the allowable prosecution of a scheme to defraud, it can be something less.

Finally, on this issue, we observe that even if the indictments were duplicitous, the error would be harmless. None of the concerns of duplicity have been implicated. There is no allegation here that the integrity of the prosecution was compromised by the particular structure of the indictment. Therefore, we conclude that counts II, III and IV of the indictment, each involving a course of activity

14

yet a single scheme, properly charged Haddy and Wynn
with violations of the securities laws.

III.

Reliance Requirement

Haddy and Wynn also argue that their convictions should
be reversed because the government did not prove that
investors actually relied upon fraudulent and manipulative
practices in purchasing or selling the subject securities.
The specific question is whether reliance is an element of
the crime of stock manipulation, proof of which is essential
to conviction. We hold that no such statutory requirement
exists.

The federal securities law were enacted largely in
response to the stock market crash of 1929. Congress
recognized the need for investors to be protected against
fraud, and that if regulatory control in the securities
industry had been in place, the turbulence created by the
crash may have, at least, been abated. S. Rep. No. 1445,
73d Cong., 2d Sess. 81 (1934). Thus, in the interest of
preventing practices that destabilized the securities market,
the Securities Act of 1933 and the Securities Exchange Act
of 1934 established systems requiring full disclosure of
material information by companies transacting in
securities. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206
(1976). The Securities and Exchange Commission then
promulgated Rule 10b-5 in 1942 to achieve the remedial
purposes of the 1934 Act. As we mentioned above, the
Supreme Court has opined that these laws should be
flexibly applied. Affiliated Ute, 406 U.S. at 151.

We again look first to the statutory language to define the
contours of the offense. Neither the statute nor the rule
includes a reliance requirement. Instead, both section 10(b)
and Rule 10b-5 prohibit the employment of manipulative
and deceptive devices in connection with the purchase or
sale of securities.

Section 10(b)'s omission of reference to a particular
victim is compelling evidence that investor reliance is not

15

required for a securities fraud conviction. The language does not proscribe deception on a purchaser or seller of a security; instead it speaks to deceptive devices employed "in connection with the purchase or sale of any security." United States v. O'Hagan, 117 S. Ct. 2199, 2210 (1997).

Rule 10b-5 also prohibits deceptive devices "as necessary or appropriate in the public interest or for the protection of investors." Under this regulation, the SEC is authorized to prohibit deceptive acts that it concludes would have deleterious effect on the integrity of the securities market and on investor confidence. See 15 U.S.C. S 78b (purpose of Exchange Act is "to insure the maintenance of fair and honest markets"). This clear language obviates the necessity of identification of a specific victim who acted upon the deception.

In United States v. Naftalin, 441 U.S. 768 (1979), the Supreme Court rejected the contention that section 17a of the Securities Act of 1933, which prohibits any device, scheme or artifice to defraud in the offer or sale of any securities, requires that the deception be perpetrated on the individual purchasing the stock. In Naftalin, an investor was prosecuted for falsely representing to a broker that he owned certain stock. The brokers who were deceived suffered losses, but not those investors who actually purchased the shares. Naftalin argued that the 1933 Act's prohibition against fraud "in" the offer of the sale of securities was narrower than section 10(b)'s proscription against deception "in connection with" the purchase or sale and, accordingly did not encompass deception directed at brokers. The Court expressed doubt that the phrases of the two Acts had different scopes; but, even assuming a narrower reach of the 1933 Act, the Court rejected the argument that it was limited to fraud on investors. Id. at 773 n.4. The Court interpreted section 17a as requiring only that the fraud occur "in" an offer or sale of securities. Id. at 772-73. We read Naftalin, then, as teaching that if fraud "in" a securities transaction, as prohibited by the 1933 Act, does not require fraud on an investor, then deception "in connection with" a securities transaction per the 1934 Act does not have such a requirement.

16

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) concerned a private right of action under the securities laws, but is nonetheless instructive on the question of reliance by identifiable victims in a criminal case. In Blue Chips, the Court limited the class of persons who may bring an action under section 10(b) and Rule 10b-5 to those who would actually purchase or sell securities. The Court imposed the purchase or sell requirement for standing purposes – recognizing the danger of litigation by investors who did not make an actual purchase but who might later claim that they would have but for the alleged deceptive conduct. Id. at 747. Significantly, in Naftalin, the Court made clear that the purchaser-seller standing rule of Blue Chips is "inapplicable" to a criminal prosecution. 441 U.S. at 774 n.6.

The statutory term "manipulation" also detracts from a theory that specific investor reliance is required. In Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77 (1977), the Supreme Court offered that manipulation is virtually a term of art in securities law and refers to conduct artificially affecting market activity in order to mislead investors. The activity described here falls within the confines of this description. Wynn and Haddy devised a scheme by which the prices of certain securities did not reflect market trends, but rather, were induced by their contrivances affecting the price of the stock. The allocation of the stock, the controlled dissemination of insider information, and the offering of bribes had the impact of artificially influencing market activity. A particular investor's reliance on the representations is the anticipated response, but it is not an element of the offense.

The issue of investor reliance was recently decided by the Supreme Court in O'Hagan in the context of a misappropriation case. Under the misappropriation theory, securities fraud is committed when a person, in connection with a securities transaction, misappropriates confidential information in breach of a duty to the source of the information. 117 S.Ct. at 2207.

The O'Hagan defendant was a partner of a lawfirm which had been retained as local counsel by a company that was planning to acquire a second company. During the

17

preparation stages of the acquisition, O'Hagan purchased call options for the target company stock, as well as shares in the target company. Following the public announcement of the tender offer, the lawyer exercised his call options, liquidated his position and realized a profit in excess of four million dollars. The Supreme Court upheld O'Hagan's conviction under section 10(b) and Rule 10b–5 on a misappropriation theory of securities fraud. The Court noted that the theory comports with 10(b)'s language, which requires deception "in connection with the purchase or sale of any security," not deception of an individual purchaser or seller. Id. At 2210. Thus, although O'Hagan differs by virtue of the theory the prosecution pursued, it is strong affirmation of the language of Nafatlin and Blue Chips that convictions under the securities laws do not require identification of or reliance by a particular victim. What distinguishes misappropriation from manipulation is the party to whom disclosure was not afforded. With manipulation, it is the investors who are deceived. With misappropriation, it is the source of the information, in most instances, the corporation involved. This distinction does not change the fact that the integrity of the free market has been compromised.

We therefore conclude that reliance on the deceptive practice by an identifiable victim participating in a securities transaction is not required for conviction in the type of stock manipulation case before us.[8]

_____

8. United States v. Russo, 74 F.3d 1383 (2d Cir. 1996), is not to the contrary. In Russo, the defendants were convicted in a stock manipulation scheme which involved short sales of high value stocks by a market maker to generate false credits in an account with a clearing broker. The district court instructed the jury that in order to find the defendants guilty of section 10(b) and Rule 10b–5 securities fraud, it must find that the clearing broker was deceived. The Court of Appeals for the Second Circuit held that the instruction was proper because "it fairly apprised the jury of the essence of the defense theory...." Id. at 1393. The case did not hold, nor was it an issue, that reliance is a required element in a securities fraud case.

IV.

Conclusion

For the reasons above, we will affirm the judgments in these criminal cases.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit