**UNITED STATES of America,**

v.

**Joseph RODRIGUEZ, Appellant (D.C. Crim No. 98–cr–00547–2),**

**United States of America,**

v.

**Charles Rodriguez, a/k/a/ Crazy Charlie, Appellant (D.C.Crim. No. 98–cr–00547–1),**

**United States of America,**

v.

**Jose Soto, Appellant (D.C.Crim. No. 98–cr–00547–3).**

Nos. 99–5965, 00–5278, 00–5266, 00–5267.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 2002.

Filed Dec. 5, 2002.

Decided Dec. 6, 2002.

his statements were involuntary.

Mark A. Berman (Argued), Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, New Jersey, for Appellant, Joseph Rodriguez.

Mitchell Scott Strutin, Philadelphia, PA, for Appellant, Charles Rodriguez.

Lisa C. Evans (Argued), Assistant Federal Public Defender, Julie A. McGrain, On the Brief, Camden, New Jersey, for Appellant, Jose Soto.

Christopher J. Christie, United States Attorney, George S. Leone, Chief, Appeals Division, Norman Gross (Argued), Assistant United States Attorney, United States Attorney's Office, Camden, New Jersey, for Appellee.

Before SLOVITER and FUENTES, Circuit Judges, and DIAMOND,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

In these consolidated appeals, Appellants Charles and Joseph Rodriguez challenge their judgments of convictions for the federal crimes of conspiracy, two bank robberies, attempted robbery, carrying and use of firearms during crimes of violence, carjacking and felons in possession of firearms. Appellant Jose Soto appeals his judgment of convictions for conspiracy, attempted robbery, carrying and use of firearms during a crime of violence and felon in possession of firearms. The Rodriguez brothers were given life sentences. Soto was sentenced to in excess of 37 years imprisonment. Appellants raise a total of nine issues on appeal. For the reasons that follow, we will affirm.

### I.

### BACKGROUND

A. *The July 19, 1997 CoreStates Bank Robbery*

The evidence at trial, viewed in the light most favorable to the government as the verdict winner, established that on July 19, 1997, at approximately 10:00 a.m., Charles Rodriguez, his brother Joseph and one or two other males entered the CoreStates Bank branch in Woodlynne, New Jersey, masked and armed. The men spoke English with a Hispanic accent and ordered the customers and employees to lie on the floor. One of the men struck a bank teller with his gun and pointed it at his face. Although the men were unsuccessful in gaining access to the bank vault, they emptied the tellers' cash drawers. They stole $64,039. The robbery was videotaped on the bank surveillance cameras. The tape shows that the robbers carried guns that looked like assault rifles. The robbers escaped in a stolen car and drove to a vacant lot in Camden, New Jersey where they set the car on fire and escaped in a second car.

B. *The May 23, 1998 Commerce Bank Robbery*

On Saturday, May 23, 1998, at approximately 8:30 a.m., Charles and Joseph Rodriguez and another male arrived at the Commerce Bank branch in Moorestown, New Jersey, masked and armed. The bank had not yet opened and the robbers shot at the door causing the glass to shatter. The robbers entered the bank and shouted in English with a Hispanic accent. They ordered the bank employees to lay on the floor. One of the robbers gave a bag to a teller and ordered her and her supervisor to fill it with cash. One of the men pointed an M16 assault rifle at the teller's head and ordered the other tellers to quickly fill the bags or he would shoot him. As in the CoreStates robbery, the robbers

---

* Hon. Gustave Diamond, Senior Judge, United States District Court for the Western District of Pennsylvania, sitting by designation.

were unable to access the vault. They took money from the teller stations at the drive through window and in the bank, and stole $15,373. A surveillance camera recorded the robbery.

The men had mechanical problems with their getaway car. They took the car of a bank employee who was arriving at work when they were leaving the bank. They abandoned the car less than a mile from the bank. The government believes that they then escaped in a second car.

## C. *The September 1, 1998 Attempted Armored Car Robbery*

In August of 1998, the Federal Bureau of Investigation was trying to locate Charles Rodriguez, who was a fugitive. Fernando Flores agreed to help the FBI locate him. Flores is a former police officer and a cousin of Charles and Joseph Rodriguez. Flores contacted Joseph and told him that he had a gun that might interest Charles. In a subsequent conversation, Flores agreed to get ammunition that Joseph requested. Joseph also told Flores that Charles was looking for a "hit," or a robbery, that would net him "six figures." App. at A1216.

Flores relayed his conversations to the FBI and, with the FBI's permission, he provided Joseph with ammunition. With respect to the robbery that Charles was looking for, FBI agents told Flores to tell Joseph that he had a friend who worked as a guard for an armored car company that supplied cash to automated teller machines at rest stops along the New Jersey Turnpike, and that his friend was in debt and would be the inside man in a robbery of the armored car in exchange for a share of the proceeds. Flores told Joseph that the armored car would have $200,000 in cash inside.

Joseph told Flores that he and Charles would participate in the robbery, that they would be armed with various firearms, including a fully automatic M16 and a fully automatic MAC10 that was suppressed with a silencer, and that he would steal cars to use during the robbery. Joseph said that they would abandon one car and use a second car, a minivan, to escape. He told Flores that when he had committed another robbery, the car had broken down and that they had carjacked another car in order to escape.

Before the robbery, Joseph and Flores drove to the rest stop to familiarize themselves with the route. Joseph introduced Flores to Jose Soto who also would participate and told him that Soto had participated in robberies with him before. Joseph called off the robbery on its scheduled date. To ensure that Joseph would go through with the robbery, the FBI told Flores to tell Joseph that he should store the weapons at Flores' apartment. Joseph called Charles on a two-way radio and Flores spoke to Charles and set a new date for the robbery.

At about 1:00 a.m. on August 30, 1998, Joseph and Soto arrived at Flores' apartment with guns, including the MAC10 with a suppression on the front and the M16, magazines, ammunition and other items for the robbery. Joseph told Flores that Charles would bring his own gun. After loading the guns and magazines for two hours, Joseph, Soto and Flores drove to the rest stop one last time. They returned to Flores' apartment and Joseph showed Flores a minivan that he had stolen to use as the "switch" car, or the second car, in the robbery.

On September 1, 1998, Charles, Joseph and Soto arrived at Flores' apartment. At one point, Joseph told Flores how he shot open glass doors during a bank robbery. Flores drove the minivan and Joseph drove a car towards the rest stop. They

dropped the minivan off at the place chosen to be the switch point. Flores then drove the group to the rest stop in the car, and they arrived at approximately 9:00 a.m. Charles, Joseph and Soto were heavily armed with various guns and ammunition.

Flores began to park in a particular spot as he had been directed by the FBI. One of the men noticed someone looking out of the window of the rest stop towards them, and Charles ordered Flores to drive to the other side of the rest stop. The FBI agents saw a gun that appeared to be an assault rifle pointed at them through the rear window of the car. FBI agents fired their guns at the car. A FBI agent hit the car from behind with a tow truck and disabled it. Joseph got out of the car and tried to enter the main rest stop building, but he was apprehended and taken into custody. Charles and Soto, who had remained in the car were arrested by FBI agents. After his arrest, Soto confessed to his involvement in the attempted robbery. Charles told the police that he should have brought better weapons. The FBI seized ammunition, clothing and other items from Flores' apartment.

## D. *The Indictment and Trial*

Charles, Joseph and Soto were charged in a Superceding Indictment containing eleven counts: conspiracy to commit bank robberies and the robbery of an armored car in violation of 18 U.S.C. § 371 (Count One), bank robbery (CoreStates) in violation of 18 U.S.C. § 2113(a) and (d) (Count Two), using and carrying firearms during a bank robbery (CoreStates) in violation of 18 U.S.C. § 924(c)(1) (Count Three), bank robbery (Commerce) in violation of 18 U.S.C. § 2113(a) and (d) (Count Four), using and carrying firearms during a bank robbery (Commerce) in violation of 18 U.S.C. § 924(c)(1) (Count Five), carjacking

in violation of 18 U.S.C. § 2119 (Count Six), obstruction of commerce by attempted robbery of an armored car in violation of 18 U.S.C. § 1951(a) (Count Seven), using and carrying firearms during the conspiracy and the attempted armored car robbery in violation of 18 U.S.C. § 924(c)(1) (Count Eight), and felons in possession of firearms in violation of 18 U.S.C. § 922(g)(1) (Counts Nine, Ten and Eleven). All three men were charged in Counts 1 to 8. Counts 9, 10 and 11 charged each defendant separately.

The case was tried before a jury which convicted Charles and Joseph of all of the charges and convicted Soto of the charges related to the attempted armored car robbery, Counts 1, 7, 8 and 11. The Rodriguez brothers were each sentenced to life imprisonment. Soto was sentenced to 447 months imprisonment.

Appellants raise a total of nine claims.

## II.

## DISCUSSION

### A. *Sufficiency of the Evidence—Attempted Armored Car Robbery*

Appellants argue that there is insufficient evidence supporting their convictions for the attempted robbery of the armored car because the government failed to prove that they intended to commit a robbery as defined by statute, or that they took a substantial step towards commission of a robbery. Because they did not preserve these issues for appeal by filing a timely motion for a judgment of acquittal, we review them for plain error. *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir.1997). The failure to prove an element of a crime beyond a reasonable doubt affects substantial rights and may constitute plain error. *Id.*

Under 18 U.S.C. § 1951(b), robbery requires a taking by actual or threatened force, violence or fear of injury. Appellants argue that Flores represented that no force would be needed because the inside man would give them the money. Although they went to the site of the attempted robbery armed, they argue that Flores told them to bring the guns so that the robbery would appear to be a taking by force. Appellants concede that they discussed the use of force at the rest stop, but state that Joseph Rodriguez had the last word on the subject, and he stated that force would not be used.

██ There is substantial evidence supporting a finding that Appellants intended to use actual or threatened force to take the money from the armored car. First, the number of guns and the amount of ammunition that they took to the rest stop went well beyond what would have been needed to create an appearance of a taking by force. In addition, Charles Rodriguez stated that he would shoot the other employees of the armored car company. While Joseph did not agree with Charles about the use of force, a jury could find from Charles' statement that the conspirators intended to use force. *See United States v. Skowronski*, 968 F.2d 242, 248 (2d Cir.1992) (although assisted by an insider, the evidence was sufficient to prove force or a threat of force where other persons were present), *abrogated on other grounds, United States v. Amato*, 46 F.3d 1255 (2d Cir.1995). Finally, a threat of force is supported by FBI agents' testimony that they fired at the Appellants' car when they saw a gun pointing at them from the car.

Appellants also argue that the evidence failed to establish that they took a substantial step to rob the armored car. *See United States v. Hsu*, 155 F.3d 189, 202–03 (3d Cir.1998) (attempt crimes require de-fendant to perform act amounting to a substantial step toward the commission of the crime). Flores' testimony that they brought firearms to his apartment for use in the robbery, spent hours loading the firearms, stole vehicles to use in the robbery, dressed for the robbery, left a switch car near the robbery location and drove to the location where the robbers anticipated the armored car would be arriving was sufficient to support a finding that the Appellants took a substantial step to rob the armored car. *See, e.g., United States v. Del Carmen Ramirez*, 823 F.2d 1, 2 (1st Cir.1987) (substantial step taken towards attempted robbery of armored truck where defendant cased the robbery site, stole a car and went to the location of the robbery shortly before the truck was to arrive).

B. *Jury Instruction Regarding the Fire-arms Offense*

Appellants next argue that the District Court erred in failing to instruct the jury to determine whether they knew that they carried a machine gun and a gun with a silencer. The carrying of these weapons led to the lengthy sentences. Our standard of review is plenary. *Gov't of Virgin Islands v. Isaac*, 50 F.3d 1175, 1180 (3d Cir.1995).

Under 18 U.S.C. § 924(c)(1), whoever, during and in relation to a crime of violence, uses or carries a firearm, shall be sentenced to a prison term of at least five years. If the firearm is a machine gun, or is equipped with a silencer, the applicable sentence is at least thirty years. *Id.* In a second or subsequent conviction under the statute, and if the firearm is a machine gun or has a silencer, the applicable sentence is life imprisonment. *Id.*

Charles and Joseph were each convicted of three counts of violating § 924(c)(1) in connection with the two bank robberies

and the attempted armored car robbery. Soto was convicted of one count in connection with the attempted armored car robbery. The jury found in answers to special interrogatories that two of the firearms related to the attempted armored car robbery were machine guns and that one had a silencer. Charles and Joseph received life sentences and Soto received a thirty year sentence.

The jury was instructed that the defendants must have had knowledge of the use or carrying of a firearm to establish a violation of § 924(c)(1). At the time of trial, courts of appeals had rejected the argument that the government also was required to show knowledge of the nature of the weapon. In *United States v. Brantley*, 68 F.3d 1283, 1290 (11th Cir.1995), for example, the Court of Appeals for the Eleventh Circuit rejected the argument advanced by Appellants here that *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), supports a mens rea requirement in § 924(c). In *Staples*, the United States Supreme Court held that under the National Firearms Act, 26 U.S.C. § 5861(d), which establishes a ten year maximum sentence for a person who possesses a machine gun that is not properly registered, *see* § 5871, the government must prove that the defendant knew that the gun was a machine gun. 511 U.S. at 602, 114 S.Ct. 1793. The Supreme Court explained that when a statute is silent as to the mental state required for a violation, the existence of a mens rea requirement is the rule rather than the exception. *Id.* at 605, 114 S.Ct. 1793. It also explained that without such a requirement in § 5861(d), the statute potentially would impose criminal sanctions on inno-

cent persons. *Id.* at 614–15, 114 S.Ct. 1793. The Supreme Court further stated that the potentially harsh penalty attached to a statutory violation supported a mens rea requirement. *Id.* at 616, 114 S.Ct. 1793.

The court in *Brantley* held that *Staples* did not suggest that enhancement statutes like § 924(c) be parsed into individual components, each one containing a mens rea requirement independent of that required to prove the underlying offense. 68 F.3d at 1289. The *Brantley* court reasoned that the concern in *Staples*, to avoid dispensing with a mens rea requirement where doing so would criminalize a range of innocent conduct, was absent in the context of sentence enhancements. *Id.* A defendant whose sentence is enhanced based on the type of weapon he carried has shown a " 'vicious will' " by committing the principal offense. *Id.* at 1290 (quoting *Staples*, 511 U.S. at 617, 114 S.Ct. 1793).

Appellants argue that *Brantley* and similar cases pre-date the Supreme Court's decisions in *Castillo v. United States*, 530 U.S. 120, 120 S.Ct. 2090, 147 L.Ed.2d 94 (2000), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), decided after the trial in this case. In *Castillo*, the Court held that the references to the firearm types in § 924(c)(1) define a separate crime that must be proven to a jury beyond a reasonable doubt. 530 U.S. at 123–24, 120 S.Ct. 2090.[1] In *Apprendi*, the Court held that any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury and proven beyond a

---

1. *Castillo* examined § 924(c)(1) before it was amended in November of 1998. Other courts of appeals have concluded that under the amended version of the statute, the classification of the weapon used is a sentencing fac-

tor, not an element of the offense. *See United States v. Sandoval*, 241 F.3d 549, 551–52 (7th Cir.), *cert. denied*, 534 U.S. 1057, 122 S.Ct. 649 (2001). The crime at issue here, however, occurred before the amendment.

reasonable doubt. 530 U.S. at 490, 120 S.Ct. 2348.

At least one court of appeals has assumed, without deciding, that *Castillo* makes the defendant's knowledge of the type of weapon an element of the offense under § 924(c)(1). In *United States v. Dixon*, 273 F.3d 636, 640–41 (5th Cir.2001), *cert. denied,* —— U.S. ——, 123 S.Ct. 125, 154 L.Ed.2d 42 (2002), the court, applying a plain error standard of review, concluded that even if the court's jury instruction was inadequate, it did not affect the defendant's substantial rights because there could be no doubt that the defendant knew the characteristics of the weapon in question.

■ Similarly, in this case, assuming without deciding that knowledge was required, any failure to submit the element of knowledge to the jury was harmless error. *See United States v. McCulligan,* 256 F.3d 97, 101 (3d Cir.2001) (the failure to submit an element of a crime to the jury is subject to harmless error review).[2] We conclude that the jury would have found that the Appellants knew that they possessed a machine gun or a gun with a silencer if the knowledge instruction was given. Flores, whose testimony was credited by the jury, testified that Joseph told him that he and Charles would be armed with various firearms, including a fully automatic M16 and a fully automatic MAC10 that was suppressed with a silencer. We also agree with the government that even if they did not know that one of the guns involved was a machine gun, Appellants cannot deny knowledge that the other was equipped with a silencer, as it was plainly affixed to the gun when they brought it to the rest stop.

C. *Outrageous Conduct by the Government*

Appellants focus much of the argument in their briefs on their contention that the District Court erred in denying their motions to dismiss the counts of the indictment related to the attempted armored car robbery based upon the alleged outrageous conduct of the government. We exercise plenary review over the District Court's legal conclusions and review any challenges to its factual findings for clear error. *United States v. Nolan–Cooper,* 155 F.3d 221, 229 (3d Cir.1998).

At a pre-trial hearing held on April 21, 1999, the District Court assumed that the facts that Appellants presented in an outline to the court in support of their claim were true, but concluded that the alleged outrageous misconduct did not rise to the level of a due process violation. The court invited Appellants to renew their motion if they obtained additional evidence in support of their claim, but denied their motion when renewed at the close of trial.

In support of their outrageousness claim, Appellants contend that unlike cases where the government seeks to infiltrate an existing criminal operation, here the FBI created a crime and induced them into committing criminal acts. They argue that Flores, directed by the FBI, allowed his apartment to be used to store guns and ammunition, organized a time to load the firearms, supplied ammunition and drove Joseph and Soto to the rest stop before the robbery attempt. Appellants also contend that Flores repeatedly called them to assure their involvement in the scheme and told them it would be an easy job, and that he yelled at them after the initially scheduled robbery was canceled. Appellants

---

**2.** The government argues that this claim is subject to plain error review. However, the Appellants preserved their claim by seeking a jury instruction providing that the jury must find that they knew the guns were machine guns.

also argue that the government placed lives at risk by allowing automatic weapons to be stored at Flores' home, giving Charles access to Flores' apartment and the weapons for several hours before the robbery attempt without arresting him, and allowing Flores and Appellants to drive to the rest stop fully armed to attempt the robbery. They argue that the government's conduct, undertaken to apprehend a fugitive, shocks the conscience, and is therefore outrageous.

Outrageous government conduct " 'is an extraordinary defense reserved only for the most egregious circumstances.' " *Nolan–Cooper*, 155 F.3d at 230–31 (quoting *United States v. Mosley*, 965 F.2d 906, 910 (10th Cir.1992)). A defendant must show that the government's conduct was "shocking, outrageous, and clearly intolerable." *Id.* at 231. In *United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983) (per curiam), a government agent told one of the defendants that he was looking for someone to burn down a building. The agent provided the defendants a gasoline can and disguises, drove them to the building, made sure that they had matches and watched while they were arrested for attempting to destroy the building by fire. We rejected the defendants' due process argument and concluded that the conduct at issue did not shock the conscience of the court. *Id.* at 13.

■ We agree with the District Court that the government's conduct in this case, assuming the truth of the allegations, falls short of that in *Beverly*, where no due process violation was found. With respect to the alleged risk of harm created by the government, there is an inherent risk of harm in an attempted armed robbery and we do not find that the government unreasonably increased that risk. *See United States v. Barbosa*, 271 F.3d 438, 470–71 (3d Cir.2001) (recognizing that if the government unreasonably surpasses dangers inherent in the targeted criminal activity in pursuing an investigation, due process may be violated). Moreover, because the District Court accepted Appellants' allegations as true in determining whether the government's conduct rose to the level of a due process violation, there was thus no need for a pretrial hearing. Appellants' due process rights were not violated by the government's conduct.[3]

## D. *Evidence of Re-enactment of Bank Robbery*

Joseph and Charles Rodriguez argue that the District Court erred in admitting evidence from a re-enactment of the July 19, 1997 CoreStates bank robbery. In an effort to prove that Joseph Rodriguez was involved in the robbery, the government re-enacted it at the bank on April 28, 1999 and videotaped it. An officer wore a red windbreaker confiscated from Joseph Rodriguez after the attempted armored car robbery. At trial, the government compared the re-enactment photographs to photographs from the actual video surveillance of the robbery, which showed one of the robbers wearing a windbreaker, and sought to show that Joseph's red jacket could have been the jacket depicted in the black and white photographs.

---

**3.** *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), relied upon in by part by Appellants, is distinguishable. In *Twigg*, a divided panel of this court found a due process violation because the defendant was lawfully minding his own affairs when a government agent generated a crime for him to commit merely for the sake of pressing charges against him. *Id.* at 381. Here, the government sought to capture Charles Rodriguez, a fugitive. We also note that three judges of the court have expressed the view that *Twigg* should be overruled. *See United States v. Jannotti*, 673 F.2d 578, 610 n. 17 (3d Cir. 1982) (en banc).

The government disclosed the photographs from the re-enactment to the defense on May 7, 1999, eleven days before trial. The defendants moved to exclude introduction of the pictures. The District Court addressed the motion at a hearing on June 15, 1999, and discussed the arrangements necessary for a counter re-enactment at the bank. On June 21, 1999, the defense notified the District Court that the bank would not allow it to take pictures without a court order, and that the bank had been remodeled that week. On June 22, 1999, the District Court denied the motion to exclude the pictures at trial. It explained that the defense could have brought the issue to the court's attention earlier and that the probative value of the evidence outweighed any prejudice. The District Court also found the conditions of the re-enactment substantially similar to the conditions at the time of the armed robbery.

Joseph Rodriguez argues that the government's late disclosure violated his due process rights by preventing him from rebutting the evidence with a counter re-enactment, or that the District Court abused its discretion in failing to suppress the belatedly disclosed evidence. Our review of a constitutional challenge to the admission of evidence is plenary. *United States v. Mitchell*, 145 F.3d 572, 576 (3d Cir.1998).

■ As the government notes, Joseph does not allege that it intentionally delayed disclosure of the evidence or that a counter re-enactment would have been exculpatory. A defense re-enactment would have only shown that the windbreaker could have been a color other than red, a point that the government conceded. In addition, the timing of the government's disclosure did not preclude the defense from performing its own re-enactment. The bank began its renovations five weeks after the defense received the re-enactment evidence. Finally, Joseph's reliance on *United States v. Wicker*, 848 F.2d 1059 (10th Cir.1988), and *United States v. Davis*, 244 F.3d 666 (8th Cir.2001), is misplaced. In these cases, the district courts excluded evidence where the prosecution failed to meet discovery deadlines, but Joseph makes no such contention here.

We also reject Charles' argument that the evidence from the re-enactment was prejudicial because the conditions of the re-enactment were not sufficiently similar to the conditions at the time of the robbery. Evidence of a demonstration is admissible if the conditions are identical or similar to the conditions of the transactions at issue. *Glick v. White Motor Co.*, 458 F.2d 1287, 1294 (3d Cir.1972).

■ The record reflects that the re-enactment was done at the same CoreStates branch as the actual robbery, that the surveillance cameras that were used focused on the same area of the bank and that none of the cameras had been moved since the robbery. The re-enactment was performed at approximately the same time of day as the robbery and both days were sunny. The photographs created from the videotapes were made using the same printers. Reviewing this claim under an abuse of discretion standard, *see Glick*, 458 F.2d at 1295, we conclude that there was no abuse of discretion.

## E.   *Effect of Activities on Interstate Commerce*

Charles Rodriguez contends that his convictions for carjacking in connection with the May 23, 1998 Commerce Bank robbery, and the attempted armored car robbery, must be vacated because the government did not prove that the Appellants' activities affected interstate commerce. Because Charles did not preserve this issue for appeal by filing a timely motion for

a judgment of acquittal, we review it for plain error. *United States v. Gaydos,* 108 F.3d 505, 509 (3d Cir.1997).

The parties had stipulated that the car contained parts from Japan and was assembled in Japan, but Charles argues this fails to prove that the carjacking interfered with interstate commerce. Similarly, Charles argues that testimony that the armored car company, that was the subject of the attempted car robbery, conducted business in 44 states and that any loss suffered in New Jersey would affect the company nationwide, was insufficient proof that the attempted robbery had an effect on interstate commerce. Without an impact on interstate commerce, Charles argues that he has not committed a federal crime.

■ Under the carjacking statute, 18 U.S.C. § 2119, the government must prove that the victim's vehicle has traveled in interstate commerce. *See United States v. Bishop,* 66 F.3d 569, 585 (3d Cir.1995). Here, the parties' stipulation that the car was assembled in Japan along with the fact that it was carjacked in New Jersey satisfied the statute's requirement.[4]

■ The statute prohibiting attempted robbery, the Hobbs Act, provides that "[w]hoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity of commerce by robbery ... or attempts or conspires so to do ... shall be fined ... or imprisoned...." 18 U.S.C. § 1951(a). In *United States v. Jannotti,* 673 F.2d 578, 591–92 (3d Cir.1982) (en banc), this court found that the statute does not require an actual effect on interstate commerce, where defendants agree or attempt to do

acts which, had they been attainable, would have affected commerce. The evidence that the earning of the armored car company would have been reduced if the attempt was successful is sufficient to establish an effect on commerce. *See United States v. Norris,* 792 F.2d 956, 958 (10th Cir.1986) (depletion of assets of armored car company engaged in interstate commerce affects commerce under § 1915(a)).

### F. Benefits to Flores in Exchange for his Testimony

Charles Rodriguez and Jose Soto argue that they are entitled to a new trial because the government violated 18 U.S.C. § 201(c)(2) by giving Fernando Flores money and other benefits in exchange for his testimony. Our standard of review is plenary. *See United States v. Kennings,* 861 F.2d 381, 387 (3d Cir.1988).

18 U.S.C. § 201(c)(2) provides:

Whoever ... directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court ... authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom ... shall be fined under this title or imprisoned for not more than two years, or both.

In *United States v. Hunte,* 193 F.3d 173, 174 (3d Cir.1999), this court held that § 201(c)(2) does not prohibit the government from promising leniency to cooperating witnesses in exchange for truthful

---

4. Joseph Rodriguez claims that his carjacking conviction must be reversed because the carjacking statute exceeds Congress' authority under the Commerce Clause. Recognizing that this court rejected this argument in *Bish-* *op,* 66 F.3d at 575–76, Joseph states that he raises the claim to preserve it in the event *Bishop* is overturned in the future. We need not address it further.

testimony. The court explained that construing the statute to preclude the government from doing so would deprive the sovereign of an established and recognized prerogative. *Id.* at 175.

Appellants rely upon language in *United States v. Singleton*, 165 F.3d 1297, 1302 (10th Cir.1999) (en banc), providing that prosecutors may not offer something "other than a concession normally granted by the government in exchange for testimony...." Like *Hunte, Singleton* holds that § 201(c)(2) does not apply to the government in the prosecution of criminal offenses. *Id.*

Appellants contend that Flores' receipt of monetary rewards, which totaled approximately $14,500, assistance with a gun permit and employment assistance are not concessions that the government normally grants.[5] The government, however, states that payment for services like Flores' is a long-established practice, and that the other assistance provided to Flores is not meaningfully distinct from that provided to informants who are placed in the Government Witness Protection Program.

■ This court has rejected the contention that the government violates § 201(c)(2) when it pays an informant who testifies at trial. *See United States v. Harris*, 210 F.3d 165, 167 (3d Cir.2000). With respect to the other concessions, we agree with the government that even if we were to adopt the *Singleton* language on which Appellants rely, they must make a prima facie showing that the concession is not normally offered. *See United States v. Jackson*, 213 F.3d 1269, 1288–89 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033, 121 S.Ct. 621, 148 L.Ed.2d 531 (2000). They have offered no authority or evidence supporting their claim.

### G. *Duplicitous Indictment*

Charles Rodriguez argues that the District Court erred in denying his pre-trial motion to dismiss Count One of the indictment, the conspiracy charge, because it is duplicitous. The District Court held that Count One does not charge separate offenses in the same count. Our standard of review is plenary. *United States v. Haddy*, 134 F.3d 542, 547 (3d Cir.1998).

■ Duplicity is the improper joining of distinct and separate offenses in a single count. *Haddy*, 134 F.3d at 548. Count One charged Appellants with conspiracy to commit the bank robberies and to obstruct commerce by robbery of the armored car. Although Charles argues that the charges of bank robbery and interference with interstate commerce are unrelated and thus not two goals of the same conspiracy, " 'the allegation in a single count of a conspiracy to commit several crimes is not duplicitous.' " *United States v. Reyes*, 930 F.2d 310, 312 (3d Cir.1991) (quoting *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942)). The conspiracy is one crime " 'however diverse its objectives.' " *Id.* The District Court did not err in denying the motion to dismiss.

### H. *Motion for a Severance*

Charles Rodriguez argues that the District Court erred in denying his motion for a severance under Federal Rule of Criminal Procedure 14. We review the District Court's ruling for an abuse of discretion. *United States v. Price*, 13 F.3d 711, 717 (3d Cir.1994).

Under Federal Rule of Criminal Procedure 14, a court may order separate trials

---

5. Charles Rodriguez also claims that he suspects that Flores was not prosecuted for his involvement in illegal weapons sales in return for his cooperation. We need not address this suspicion as it is unsupported by the record.

of counts in an indictment if it appears that a defendant is prejudiced by a joinder of offenses. *See* Fed.R.Crim.P. 14. Charles argues that the joinder of the attempted armored car robbery and the two bank robberies prejudiced him because the cases against him for the bank robberies were circumstantial, the connections between the bank robberies and the attempted armored car robbery were insubstantial, and there was the danger of a spillover effect of the evidence related to the attempted armored car robbery.

The District Court found that the indictment satisfied Federal Rule of Criminal Procedure 8, which allows two or more offenses to be charged in the same indictment if the offenses are of the same or similar character. It also found that the conspiracy charge warranted the joinder of the offenses. With respect to the alleged prejudice, the District Court concluded that the defense had not shown a compromise of a specific trial right, and that there was not a sufficient showing with regard to a spillover effect of evidence to require a severance. The District Court also stated that the case was not so complicated as to necessarily confuse the jury.

In *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court considered whether a severance of defendants was required under Rule 14. It stated that when the defendants have been properly joined under Rule 8, a severance should be granted under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. Charles does not argue that a specific trial right was compromised by joining the offenses in one trial. We agree with the District Court that he has not shown that a spill-over effect of the evidence prevented the jury from making a reliable judgment about his guilt or innocence. Although Charles argues that the jury "may have been so impacted by the enormity of the testimony concerning the attempted robbery of the armored car that it could not reasonably be expected to compartmentalize the evidence," Br. of Charles Rodriguez at 33, the jury did indeed compartmentalize the evidence as it acquitted Soto on the bank robbery charges but convicted him on the attempted armored car robbery charges. Charles has not established that the District Court abused its discretion in denying his motion for a severance.

I. *Sufficiency of the Evidence—Carjacking*

Finally, Charles and Joseph contend that the government failed to prove the elements of carjacking in connection with the Commerce Bank robbery beyond a reasonable doubt. They argue that there is insufficient evidence that the car was taken by force or intimidation and with the intent to cause death or serious bodily injury. Our standard of review is highly deferential. *United States v. Helbling,* 209 F.3d 226, 238 (3d Cir.2000). " 'We determine whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict.' " *Id.* (quoting *Gov't of Virgin Islands v. Charles,* 72 F.3d 401, 410 (3d Cir.1995)).

The carjacking statute prohibits the taking of a car by force and violence or by intimidation with the intent to cause death or serious bodily harm. *See* 18 U.S.C. § 2119. The bank employee testified that as she arrived at work, one of the robbers pointed a "very large gun" at her face, App. at A3104, and told her to lie down on the ground. The employee did so and laid on top of the glass from the door

that had shattered when the robbers shot it open. The employee heard the robbers get in a car. After the robbers' car stalled, one robber said "... get that girl's keys." App. at A3107. One robber walked towards her and told her to give them her "f ------ keys" and, after she dropped her keys, told her to tell him which "f ------ car" was hers. App. at 3108–09. The employee testified that she complied with the robber's request for the keys because she was scared that they were going to kill her. This evidence is sufficient to support a finding that the car was taken by intimidation.

The evidence was also sufficient to establish that the car was taken with the intent to cause death or serious bodily harm. The government was required to show an intent to harm the employee if she failed to surrender her car. *See United States v. Anderson*, 108 F.3d 478, 485 (3d Cir.1997) (holding that the statute requires conditional intent). Under the circumstances, where the robbers were armed, had just robbed a bank and had no other means of escape, the jury could infer that the robber who took her keys intended to seriously harm her if she refused to give them to him.

### III.

### CONCLUSION

For the reasons set forth above, we reject all of Appellants' various contentions, and we will affirm the judgments of convictions.