SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

LUCENT TECHNOLOGIES INC., Nina Aversano, Jay Carter, Alice Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliot, Vanessa Petrini, Michelle Hayes–Bullock, and David Ackerman, Defendants.

Civ. No. 04–2315 (WHW).

United States District Court, D. New Jersey.

April 6, 2005.

Mauro Michael Wolfe, Office of the United States Attorney, Newark, NJ, for Movant and Intervenor Plaintiff.

Mark A. Adler, U.S. Securities and Exchange Commission, Washington, DC, for Plaintiff.

Edward T. Kole, Wilentz, Goldman & Spitzer, Esqs., Woodbridge, NJ, Donna L. Gordon, Leboeuf, Lamb, Greene & Macrae, L.L.P., New York, NY, Barry H. Evenchick, Walder, Hayden & Brogan, P.A., Sheila A. Sadighi, Lowenstein Sandler PC, Roseland, NJ, Claudia A. Costa, Stryker, Tams & Dill, Newark, NJ, Wilfred P. Coronato, Hughes, Hubbard & Reed LLP, Jersey City, NJ, for Defendants.

## OPINION

WALLS, District Judge.

Defendants Jay Carter and Michelle Hayes–Bullock move separately to dismiss certain claims in the Complaint. The Court will address all of these motions in this opinion.

## FACTS AND PROCEDURAL BACKGROUND

The Complaint alleges the following: Lucent Technologies Inc. ("Lucent") fraudulently and improperly recognized revenue and pre-tax income in violation of generally accepted accounting principles ("GAAP") during its fiscal year 2000. As a result, Lucent improperly overstated its pre-tax income that fiscal year by sixteen percent. Lucent prematurely recognized $511 million of revenue and $91 million in pre-tax income in quarterly results during Lucent's fiscal year 2000. The remaining $637 million in revenue and $379 million in pre-tax income should not have been recognized at all during Lucent's fiscal year 2000. Lucent's violations of GAAP were due to the fraudulent and reckless actions of the other named defendants who were officers, executives and employees of Lucent. The GAAP violations were also the result of deficient internal controls that led to numerous accounting errors by others.

Defendant Jay Carter was president of Lucent's AT & T customer business unit from July 1997 to September 2000, with global responsibility for sales and marketing of Lucent's products to AT & T. Defendant Michelle Hayes–Bullock was a Lucent finance director with chief financial officer ("CFO") responsibilities for the AT & T customer business unit from January 2000 to January 2001; she reported to Jay Carter.

Starting in the summer of 1999, Lucent and AT & T Wireless Services, Inc. ("AWS") began to negotiate a new business model known as Voice Path Pricing ("VPP"). Under VPP, AWS would no longer pay Lucent according to a conventional pricing model which entailed sales of individual pieces of equipment that make up a telecommunications network. Instead, AWS would pay a price for each voice path—in essence pay for each data/voice connection that could be handled on the finished network. The parties initially anticipated that VPP would take effect April 1, 2000, but the new contract was not ultimately signed until August 2000. While continuing to negotiate the VPP agreement, Carter authorized his subordinates to enter into an oral agreement with their AWS counterparts that VPP would be retroactively applied to products purchased by AWS between April 1, 2000 and the date the VPP agreement was finally reached (the "interim period"). As part of this oral agreement, any pricing differential between VPP and conventional pricing for products purchased during this interim period would be adjusted through credits via a "true-up" process once the VPP agreement was finalized. In effect, the parties agreed to have VPP commence on April 1, 2000.

Hayes–Bullock was aware of this oral agreement because she had been explicitly told about it, both by a subordinate in the finance division and by at least one of the sales executives who made the agreement on behalf of Lucent. As finance director with CFO responsibilities for the AT & T customer business unit, she was responsible for ensuring that Lucent's financial statements complied with GAAP for transactions originating within that unit.

During the interim period, Lucent provided AWS with switching equipment valued at $53 million under conventional pricing. The switching equipment was provided to AWS without a purchase order, and, as a result, appeared in certain internal Lucent reports as inventory that had been shipped but not invoiced. In order to recognize revenues on the switches, Carter instructed his subordinates to obtain a purchase order from AWS for the switches. AWS provided a purchase order at the end of Lucent's third quarter of fiscal year 2000 with the expressed understanding that-in conformity with the original oral understanding— Lucent would provide a credit for that invoiced amount and that AWS would ultimately pay the VPP price for the equipment.

On June 30, 2000, at the end of Lucent's third quarter of its fiscal year, the switching equipment was invoiced under conventional pricing and Lucent violated GAAP by recognizing revenue and operating income in the amount of $53 million. Carter and Hayes–Bullock knew, or were reckless in not knowing, that Lucent's recognition of the revenue and operating income violated GAAP. And, so plaintiff alleges, Carter and Hayes–Bullock also took affirmative steps to mislead Lucent's chief accountant about the existence and nature of the oral agreement with AWS. More specifically, Hayes–Bullock drafted, and/or assisted in drafting, a letter to the chief accountant that falsely suggested that there were no credit agreements with AWS. Carter executed versions of that letter on September 8 and September 26, 2000. In the September 8, 2000 letter, Carter falsely represented that the June 30, 2000 invoice to AWS was "payable when due and that any credits earned will be applied against future purchase for wireless products." In the September 26, 2000 letter, Carter wrote that "[i]f as in the past, Lucent were to offer AT & T credits in return for future volume purchases, they would be earned by AT & T when the volume commitments were achieved," falsely suggesting that Lucent had not offered AWS an opportunity to earn credits.

Under GAAP as summarized by FASB Concepts Statement No. 5 ("CON 5"), before Lucent can recognize revenue in a given transaction, the revenue must be both realized and earned. To be realizable, collection of the sales price must be reasonably assured. Moreover, notwithstanding the delivery and transfer of title to the equipment, FASB Statement No. 48 ("FAS 48") requires that the price AWS will ultimately pay be fixed and determinable.

The result of the oral agreement authorized by Carter was that the price AWS would ultimately pay was not fixed and determinable because the ultimate VPP price had not yet been determined. In addition, the Complaint charges, Lucent could have no expectation that it would collect $53 million for the switching equipment because the parties had orally agreed that AWS would receive an offsetting credit. This meant that the collection of the sales price was not reasonably assured, and the criteria for recognizing revenue under CON 5 were not satisfied.

The Complaint further alleges that both Carter and Hayes–Bullock knowingly or recklessly engaged in this fraudulent conduct, as a result of which, Lucent materially overstated pre-tax income by $53 million in its financial statements filed with the SEC in Form 10–Q for its third quarter of fiscal year 2000. It also charges that both Carter and Hayes–Bullock knew, or were reckless in not knowing, that, as a result of their fraudulent conduct, Lucent filed materially false financial statements.

Based on these allegations, plaintiff alleges four counts against Carter and Hayes–Bullock: Count One of the Complaint alleges that Carter and Hayes–Bullock violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b–5, and that they are also liable for aiding and abetting Lucent in violating such laws. Count Three alleges that Carter and Hayes–Bullock aided and abetted Lucent in violating Section 13(a) of the Exchange Act, Rules 12b–20, 13a–11 and 13a–13 by causing Lucent to file materially false and misleading financial statements in the fiscal year 2000. Count Four alleges that Carter and Hayes–Bullock aided and abetted Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Five alleges that Carter and Hayes–Bullock violated Section 13(b)(5) of the Exchange Act by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records.

## STANDARD FOR A RULE 12(b)(6) MOTION TO DISMISS

On a motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6), a court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

While a court will accept well-plead allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. See *Miree v. DeKalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed. R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See *Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003); *see also* 5A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 at 299 (2d ed.1990).

"A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Federal Reserve Bank of N.Y.,* 359 F.3d 251, 255 n. 5 (3d Cir.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim

is based by failing to attach or explicitly cite them." *Id.*

## DISCUSSION

### I. Carter

Carter argues that all of the claims against him should be dismissed. His arguments will be addressed in turn.

#### A. Count One—Primary Liability

As to the fraud claims against him, Carter contends that they must fail for several reasons. First, he asserts that the fraud claim can not succeed because it is based on a future event and there was no violation of GAAP. Second, he charges that the SEC has failed to plead fraud with particularity. And finally, he contends that the SEC has inadequately pled scienter.

##### 1. Fraud Based on Future Event and Violations of GAAP

Carter charges that fraud claims cannot be based on contingent future events or be sustained where GAAP supports the revenue recognition at issue. He asserts that, as alleged, reaching a VPP agreement with AWS was a contingent future event when Lucent recognized the $53 million value of the switching equipment as revenue.

■ Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly, ... to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 renders the following conduct illegal:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b). To establish a violation of Section 10(b) and Rule 10b–5, the SEC must plead facts demonstrating that the defendant: (1) made a misrepresentation, or an omission (where there was a duty to speak), or other fraudulent device; (2) that was material in the case of a misrepresentation or omission; (3) in connection with the purchase or sale of a security; (4) where the defendant acted with scienter; and (5) the involvement of interstate commerce, the mails or a national securities exchange. *S.E.C. v. Adoni,* 60 F.Supp.2d 401, 405 (D.N.J.1999). Unlike a private litigant, however, the SEC need not prove either reliance or damages. *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 206 n. 6 (3d Cir.2001); *United States v. Haddy,* 134 F.3d 542, 549 (3d Cir.1998).

■ Carter contends that it was not fraudulent to recognize the $53 million in revenue because the Complaint, as alleged, implies that conventional pricing was still in place when the revenue was recognized and the oral agreement to credit AWS for the purchase was contingent upon Lucent and AWS finalizing the VPP agreement. Carter cites several cases, none of which are factually similar to the circumstances here, for the proposition that a material misstatement or omission involving a future event is not actionable as fraud. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,*

*Inc.,* 75 F.3d 801, 811 (2d Cir.1996); *Continental Bank, N.A., v. Meyer,* 10 F.3d 1293, 1299 (7th Cir.1993); *Mardini v. Viking Freight, Inc.,* 92 F.Supp.2d 378, 385 (D.N.J.1999). This situation here is unlike forward-looking statements, opinions and representations about future events such as the way an employee will be evaluated for promotions. While the Court is by no means defining the contours of the Complaint, as the Court reads it, the fraud alleged by the SEC is in recognizing the $53 million as revenue when Carter knew, or was reckless in not knowing, that that amount was not realizable or fixed and determinable because of the oral side agreement with AWS. This is not the same as an unactionable fraud claim predicated on a future event.

■ The second part of Carter's first argument is that GAAP supports the recognition of the $53 million as revenue, and, hence, the SEC's contention that GAAP was violated by this transaction fails as a matter of law. More specifically, Carter declares that FAS 48 does not apply to the sale of the switching equipment because the sale did not include a right of return. He also argues that the revenue recognition was consistent with CON 5. In response to a similar argument, however, the Third Circuit has held that whether a defendant's accounting practices were consistent with GAAP was a question of fact, thereby rendering it inappropriate to grant a motion to dismiss a securities fraud claim based on that ground. *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1421 (3d Cir.1997). The Court is unpersuaded that the fraud claims against Carter should be dismissed based on this argument.

### 2. *Failure to Plead Fraud with Particularity*

Carter's next challenge is that the SEC has failed to meet the requirements of Rule 9(b) with regard to its Section 10(b) claim. Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This requirement has been "rigorously applied in securities fraud cases." *California Public Employees' Retirement System v. Chubb Corp.,* 394 F.3d 126, 144 (3d Cir.2004). To satisfy Rule 9(b), the plaintiff must plead with particularity "the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of America,* 361 F.3d 217, 223–24 (3d Cir. 2004) (quoting *Seville Indus. Machinery v. Southmost Machinery,* 742 F.2d 786, 791 (3d Cir.1984)). This requirement may be satisfied two ways: First, a plaintiff can plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *Chubb Corp.,* 394 F.3d at 144 (quoting *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999)). Second, the requirement can be satisfied through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Lum,* 361 F.3d at 223–24 (quoting *Seville Indus. Machinery,* 742 F.2d at 791 (holding that a plaintiff satisfied Rule 9(b) by pleading which machines were the subject of alleged fraudulent transactions and the nature and subject of the alleged misrepresentations)). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* (citations omitted). The Third Circuit has held that allegations which indicate the general content of a representation but fail to indicate who the speakers were or who received the information are inadequate to meet the requirements of Rule 9(b). *See*

*Saporito v. Combustion Engineering Inc.,* 843 F.2d 666, 675 (3d Cir.1988), vacated on other grounds, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989).

■ Carter says that the Complaint only contains three specific allegations about him: that he authorized the oral agreement with AWS; that he instructed his subordinates to obtain a purchase order for the switching equipment; and that he signed two letters to Lucent's Chief Accountant suggesting that there was no credit agreement with AWS. He charges that there is no allegation as to how, if at all, he was involved in the revenue recognition of the $53 million. He asserts that the "what, when, where, and how" are missing from the Complaint. He also notes that to the extent the SEC is relying on the letters as a basis for the claim, these letters are irrelevant because they were signed in September, more than two months after the revenue was recognized on June 30, 2000.

The SEC responds that the Complaint adequately pleads fraud with particularity under the "who, what, when, where, and how" standard. The "who" is Carter. The "what," according to the SEC, is "a fraudulent scheme designed to create the false appearance that Lucent had sold certain switching equipment to AWS under Lucent's conventional pricing for $53 million, so that Lucent could book $53 million in revenue in its fiscal third quarter in violation of GAAP." (Pl.'s Br. at 13). The SEC claims that the "how" is alleged in that Carter authorized his subordinates to enter the oral agreement with AWS and instructed them to obtain a purchase order. The SEC also relies on the letters as evidence of the affirmative steps Carter took to mislead the Chief accountant. The "when" and "where" of the fraud is also adequately alleged, the SEC contends, in

that it provides the date on which the revenue was recognized on Lucent's books.

While it is true that conclusory allegations are insufficient to satisfy the requirements of Rule 9(b), the Court is satisfied that the SEC has sufficiently pled fraud with particularity in the claims against Carter. Contrary to Carter's arguments, the Complaint notes with particular specificity the actions taken by Carter that support the fraud claims: 1) Carter authorized a side oral agreement that made the price of equipment purchased in the interim period uncertain, 2) he instructed his subordinates to obtain a purchase order for the equipment sent to AWS during the interim period while, 3) knowing that the price of the equipment was uncertain because of the side agreement. These allegations, as well as those noting the "who, when, and where," satisfy the requirements of Rule 9(b).

### 3. Scienter

■ With regard to the requirement that a plaintiff plead facts demonstrating that a defendant acted with scienter, the Third Circuit has defined "scienter" in the context of securities fraud as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma Inc. Securities Litigation,* 372 F.3d 137, 148 (3d Cir.2004) (quoting *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 667 (3d Cir.2002)). Rule 9(b) provides that, in the context of pleading fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." The

Private Securities Litigation Reform Act of 1995 ("PLSRA") adds an additional requirement, providing that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The parties appear to agree, however, and the case law supports the conclusion, that the heightened requirements for pleading scienter under the PSLRA do not apply to actions brought by the SEC. *E.g., S.E.C. v. Prater,* 296 F.Supp.2d 210, 215 (D.Conn.2003) ("Since actions brought by the SEC are not considered 'private litigation,' the standard imposed in the PSLRA for pleading scienter does not apply to the SEC."); *U.S. S.E.C. v. ICN Pharmaceuticals, Inc.,* 84 F.Supp.2d 1097, 1099 (C.D.Cal.2000) ("[T]he 'more rigorous' pleading requirements under the PSLRA, which go beyond the Rule 9(b) requirements only apply to private securities fraud actions; they do not apply to a case, such as this, brought by the SEC."); *S.E.C. v. Blackman,* 2000 WL 868770, *5 (M.D.Tenn. May 26, 2000) (agreeing with the SEC that the pleading requirement of the PSLRA does not apply to the SEC).

To adequately plead scienter, regardless whether the PSLRA applies, a plaintiff must either "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1422 (3d Cir.1997). As said, because the PSLRA does not apply, the SEC is exempt from the PSLRA's additional requirement of pleading scienter with particularity. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 533–35 (3d Cir.1999) (noting that the PSLRA differs from the previous standard for pleading scienter only in that it requires that it be pled with

particularity). It follows then that to the extent Carter claims that the SEC must plead scienter with particularity, this assertion is incorrect.

Moving to the substance of the issue, Carter argues that the SEC has failed to adequately allege facts which would satisfy either of the permitted means of demonstrating scienter. Contrary to that assertion, however, the Court is satisfied that the facts alleged identify circumstances indicating conscious or reckless behavior by Carter. His actions and his letters to the chief accountant can give rise to the inference that Carter did not want the Chief accountant to know of the oral side agreement he had authorized his subordinates to enter into with AWS. While the Court agrees with Carter's assertion that misconduct that occurs after a supposedly fraudulent transaction cannot be the basis of a fraud claim arising from that transaction, *see Jones v. Intelli–Check, Inc.,* 274 F.Supp.2d 615 (D.N.J.2003), common sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind. As example, that a person takes certain steps to cover up a misdeed is certainly relevant evidence that the person knew he had made a mistake. The letters described in the Complaint sufficiently indicate circumstances which would support a finding of conscious or reckless behavior on the part of Carter. Because the Court finds that the SEC has sufficiently alleged scienter in one of the two permissible ways, it is unnecessary to consider whether the SEC has also pled scienter by alleging facts that show both a motive and a clear opportunity for committing the fraud.

Carter's motion to dismiss Count One of the Complaint for failure to state a claim

upon which relief can be granted and to properly plead fraud or scienter is denied.

### B. Count One—Secondary Liability

■ Carter contends that the aiding and abetting claim in Count One of the Complaint must be dismissed because the SEC cannot establish the first element of an aiding and abetting claim. To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir.1978). In a footnote, Carter repeats that the claim cannot be satisfied because the fraud is based on a future event and the transaction did not violate GAAP. These are the same arguments Carter advanced to dismiss the primary liability claim. And for the same reasons, the Court finds these arguments unavailing. Carter's motion to dismiss the securities fraud aiding and abetting claim is denied.

1. Section 13(a) and the rules referenced provide that an issuer of securities must file certain documents with the SEC and that such documents must contain certain information so as to not be misleading. Implicit in these provisions is the requirement that the information submitted be true and correct. *GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971).

2. Sections 13(b)(2)(A) and 13(b)(2)(B) provide:

   (2) Every issuer which has a class of securities registered pursuant to section 78*l* of this title and every issuer which is required to file reports pursuant to section 78*o*(d) of this title shall—
   (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

### C. Counts Three, Four and Five

In support of his motion to dismiss Counts Three, Four and Five of the Complaint, Carter argues that these claims must fail because Lucent properly recognized the $53 million in revenue according to GAAP. To recap, Count Three alleges that Carter aided and abetted Lucent in violating Section 13(a) of the Exchange Act and Rules 12b–20, 13a–11 and 13a–13 by causing Lucent to file materially false and misleading financial statements in the fiscal year 2000.[1] Count Four alleges that he aided and abetted Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls.[2] Count Five alleges that Carter violated Section 13(b)(5) of the Exchange Act and Rule 13b2–1 by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records.[3]

   (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
   (i) transactions are executed in accordance with management's general or specific authorization;
   (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
   (iii) access to assets is permitted only in accordance with management's general or specific authorization; and
   (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences;

3. Section 13(b)(5) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting

As to the Section 13(a) claim, Carter asserts, without any legal support, that the claim must fail because the revenue recognition of the $53 million was in accordance with GAAP, making the 8–K and 10–Q documents at issue accurate. As the Court noted earlier, however, whether the money was recognized as revenue in accordance with GAAP is a question of fact, and not appropriate to consider on a motion to dismiss.

■ As to the alleged violations of Sections 13(b) found in Counts Four and Five, Carter says that the Complaint fails to allege the elements that support such a claim. Unfortunately, he misstates the law. In the case he relies on, *S.E.C. v. Gallagher*, 1989 WL 95252, *6 (E.D.Pa. Aug.16, 1989), the element he points to— that "there has been a commission of a wrongful act—an underlying securities violation"—is an element of a Section 13(a) claim, not a Section 13(b) claim. Carter also advances *S.E.C. v. Autocorp Equities, Inc.*, 292 F.Supp.2d 1310, 1331–32 (D.Utah 2003), for the proposition that to prevail on an aiding and abetting Section 13(b)(2)(A) claim, the SEC "must establish knowledge or reckless disregard of the fact that the defendant was aiding or abetting a violation of securities law." He again argues that the SEC can not establish this element because the revenue recognition was proper under GAAP. For the same reasons stated before, this argument fails. The Court is also satisfied, for the same reasons expressed in the discussion of the fraud claims, that the SEC has sufficiently pled facts to support the inference that Carter acted with knowledge or in reckless disregard in aiding and abetting Lucent's violations of Section 13(b). Carter's mo-

tion to dismiss the Third, Fourth and Fifth Counts of the Complaint is denied.

## II. Hayes–Bullock

Hayes–Bullock contends that all of the claims against her should be dismissed. As with Carter, the Court will consider her arguments in turn.

### A. Count One—Primary Liability

Hayes–Bullock proposes four reasons why the SEC has failed to state a claim against her for violation of Section 10(b) and Rule 10b–5. First, that the SEC has failed to allege that she made a misstatement or omission. Second, that the SEC has failed to allege any misstatement or omission in connection with the AWS transaction. Third, that the SEC has inadequately pled scienter. And fourth, that the statement at issue is not material as a matter of law. HayesBullock also contends that the SEC has failed to allege the necessary elements for the aiding and abetting claim against her.

### 1. Failure to Allege a Misstatement or Omission

■ Hayes–Bullock first argues that the SEC has failed to allege that she made any misstatement or omission, a necessary element to state a claim under Section 10(b) and Rule 10b–5. She says that, to the extent the SEC alleges that Lucent's recognition of the $53 million as revenue in the third quarter of its fiscal year was a misstatement, the claim against her must fail because nowhere is there an allegation that she made the statement.

Under these circumstances, whether a claim can be maintained against her for a primary violation of Section 10(b) and Rule

controls or knowingly falsify any book, record, or account described in paragraph (2)." 15 U.S.C. 78m(5). Rule 13b2–1 provides that "[n]o person shall directly or indirectly, falsify

or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act." 17 CFR § 240.13b2–1.

10b–5 is another source of disagreement between the parties. The Third Circuit has not yet resolved the issue by defining the appropriate legal standard. The emergence of two standards for determining whether a secondary actor can be a primary violator of Section 10(b) and Rule 10b–5 is the result of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). There, the Supreme Court announced that a private plaintiff may not maintain an aiding and abetting suit under Section 10(b), but such claims may be brought by the SEC. The Court also said that "[a]ny person or entity, including a lawyer, accountant or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met." *Id.* at 191, 114 S.Ct. 1439. This has sparked the emergence of different tests for judging when persons and entities can be liable as primary violators.

Hayes–Bullock advocates that the Court follow the "bright line" test that a person must actually make the material misstatement or omission and "the misrepresentation must be attributed to the specific actor at the time of public dissemination" in order to be a primary violator. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 174–75 (2d Cir.1998); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 583 (S.D.Tex.2002). In *Wright*, the Second Circuit found that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)." 152

F.3d at 175. In finding that the misstatement must be attributed to the actor, the court said that a contrary holding "would circumvent the reliance requirements of the Act, because '[r]eliance only on representations made by others cannot itself be the basis of liability.' " *Id.* (quoting *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1225 (10 th Cir.1996)). Hayes–Bullock argues that in the context of pleading a primary violation, a plaintiff must attribute the misstatement or omission to each defendant who is alleged to have violated the statute, and that the SEC has not done so. *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F.Supp.2d 417, 428–29 (D.N.J.1999) (noting that a plaintiff cannot "merely lump[ ] together all defendants without specifically stating what role the ... defendants had in the alleged fraud and how that role was carried out."). She further contends that a plaintiff must plead a specific link between the defendant and the alleged misstatement, omission or fraudulent act. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1249 (2d Cir.1987); *Kennilworth*, 59 F.Supp.2d at 430 ("Most importantly, the plaintiffs do not sufficiently link the defendants, directly and specifically, with incidents or circumstances which, apart from their positions or roles within the various companies, connect them to wrongdoing and create a 'strong inference' of scienter."). Hayes–Bullock also relies on *Copland v. Grumet*, 88 F.Supp.2d 326, 330 (D.N.J.1999), where the plaintiffs alleged that two officers of the defendant corporation were primarily liable for a Section 10(b) and Rule 10b–5 violation because "they were directly involved in the process of creating and reviewing the financial statements ... which contained false and misleading information...." Those defendants argued, like Hayes–Bullock, that the plaintiffs were required

to plead facts consistent with the "bright line" test. The plaintiffs countered that under another, earlier Second Circuit case, *SEC v. First Jersey Securities*, 101 F.3d 1450 (1996), primary liability could be imposed not only on those people who had made fraudulent representations but also on those people who "had knowledge of the fraud and assisted in its perpetration." *Copland*, 88 F.Supp.2d at 330 (quoting *First Jersey Securities*, 101 F.3d at 1471). The *Copland* court applied the "bright line" test and found that the officer defendants' alleged participation in the making of fraudulent representations "cannot be considered the equivalent of *making* the false statements themselves." *Id.* at 332 (emphasis in original). The *Copland* court also noted that while the defendant in *Wright* was an accounting firm that had privately but not publicly approved the defendant's financial statements, "there is nothing in *Wright* that indicates that its holding is limited to the facts of that case." *Copland*, 88 F.Supp.2d at 332, n. 9. The *Copland* court rejected the plaintiffs' arguments in favor of the Second Circuit's position on the issue because "it is consistent with the Supreme Court's holding in *Central Bank* and faithful to the statutory language of 10(b)." *Id.* at 333. "In our view, holding individual defendants liable under § 10(b) for the orchestration of a company's fraudulent financial reports runs afoul of the court's holdings in *Shapiro* and *Anixter* and the notion that only speakers may be held liable for their material misstatements under this aspect of Rule 10b–5 and § 10(b)." *Id.* at 334. *See Shapiro v. Cantor*, 123 F.3d 717, 720–21 (2d Cir.1997) ("A claim under § 10(b)

must allege a defendant has made a material misstatement or omission indicating an intent to deceive or defraud in connection with the purchase or sale of securities."); *Anixter*, 77 F.3d at 1226 n. 10 ("Some post-*Central Bank* cases have held that third party defendants can be liable for statements made by others, where the defendant substantially participated in preparing the statements.... To the extent that these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the substantial assistance element of aiding and abetting liability into primary liability, they do not comport with *Central Bank*."). The *Copland* court did not directly comment on the *First Jersey* case, instead distinguishing the case before it from other cases also relied on by the plaintiffs. To resolve the apparent conflict between *First Jersey* and *Wright*, the Second Circuit itself, however, has indicated that *First Jersey* is distinguishable because it was about the primary liability of "controlling persons," rather than secondary actors.[4] *See Wright*, 152 F.3d at 175–76. There is no allegation or argument by the SEC that Hayes–Bullock qualifies as a "control person."

The SEC concedes that Hayes–Bullock did not directly make the misstatement in Lucent's financial statements, but argues that the primary liability claim against her is proper regardless. The SEC contends that actors who are "indirectly" responsible for the making of a material misstatement can be liable as primary violators of Section 10(b) and Rule 10b–5 when scienter is proven. The SEC relies on the express language of Section 10(b) which

---

4. "Control person" liability is a separate type of securities fraud liability that is not at issue here. It is "predicated upon the theory that certain corporate insiders have the power and obligation to supervise or 'control' the day-to-day 'policy and decision-making processes' of

the persons beneath them who are alleged to have committed the primary wrong." *Copland*, 88 F.Supp.2d at 334 (quoting *Riggs v. Schappell*, 939 F.Supp. 321, 327 (D.N.J. 1996)).

makes it unlawful for people to engage in the prohibited acts, either "directly or indirectly," to support this argument. The SEC also emphasizes that this case should be distinguished from cases where the secondary actors are outsiders like accountants or lawyers because the secondary actor here is an insider. It also cites a number of cases to support its position and points to the detailed analysis undertaken by the court in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 583 (S.D.Tex.2002) regarding the issue of primary liability for secondary actors. The *Enron* court considered the "bright line" test, the "substantial participation" test and the test advocated by the SEC in its *amicus curiae* brief. The "substantial participation" test provides for primary liability where there is " 'substantial participation or intricate involvement' of the secondary party in the preparation of fraudulent statements 'even though that participation might not lead to the actor's actual making of the statements.' " *Id.* at 585 (quoting *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir. 2000)). The *Enron* court ultimately rejected the "bright line" and "substantial participation" tests in favor of the one offered by the SEC: "when a person, acting alone or with others, creates a misrepresentation, ... the person can be liable as a primary violator ... if ... he acts with the requisite scienter." *Id.* at 588, 590–91. Thus, under the *Enron* test, a person, although not publicly associated with a misstatement that she created, could still be liable as a primary violator.

The Third Circuit has yet to definitively decide whether a person or entity can be a primary violator of Section 10(b) on the basis of substantial participation in the creation of a company's misstatements.[5] And although this Court is not bound by the *Copland* decision, it is a source of guidance. It seems that the reason some courts have been reluctant to adopt the "substantial participation" test or some variation is because of their concern that it would revive what was aiding and abetting liability in private actions but under the umbrella of primary liability. This would run afoul of the Supreme Court's decision in *Central Bank.* The Second Circuit was also concerned that if the misstatement were not attributed to the defendant, it would circumvent the reliance requirement. Neither of these concerns is present in the context of SEC actions because the SEC is not barred from bringing aiding and abetting claims and the SEC does not have to prove reliance as an element of fraud. In light of these differences, the same test need not be applied in actions brought by the SEC and by private plaintiffs in the interest of consistency. That is not to say, however, that the same test should not be applied for other reasons. As example, the concern articulated by the *Copland* court that the test be consistent with the statutory language of Section 10(b) and Rule 10b–5 is also present in an SEC action. Here, the Court looks to other reasons besides those specific to cases involving private plaintiffs for why it should choose one test over the other.

**5.** In 1998, the Third Circuit granted an en banc hearing and vacated the decision of the panel in *Klein v. Boyd,* Fed. Sec. L. Rep. P 90,136 (3rd Cir.1998) rehearing en banc granted, judgment vacated Mar. 9, 1998. The panel held that lawyers who significantly participate in their client's misrepresentations, to such a degree that they may fairly be deemed authors or co-authors of the misrepresentations, can be held liable as primary violators. *Id.* at 90,325. After the order granting an en banc hearing was entered, the parties settled the litigation and the en banc hearing never happened. While this is not an indication of how the Third Circuit would have decided this issue had the hearing occurred, the Court finds this event to be noteworthy.

The "bright line" test severely limits the scope of actors who can be held primarily liable under Section 10(b), and is a strict interpretation of Section 10(b) and Rule 10b–5, which make it unlawful for actors "to make" a misstatement. The test has been adopted by both the Second and Eleventh Circuits. *See Wright,* 152 F.3d at 175; *Ziemba v. Cascade Intern'l, Inc.,* 256 F.3d 1194, 1205, 1207 (11th Cir.2001). The Tenth Circuit has also adopted the "bright line" test but it does not require attribution. *See Anixter v. Home–Stake Production Co.,* 77 F.3d 1215 (10th Cir. 1996). Some district courts in this circuit have also used it. *See Copland,* 88 F.Supp.2d at 330; *In re Rent–Way Sec. Litig.,* 209 F.Supp.2d 493, 503 (W.D.Pa. 2002). The "substantial participation" test and its variation adopted by the *Enron* court take a broader view of what is proscribed by Section 10(b). "Substantial participation" has been adopted only by the Ninth Circuit. *See Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1061 n. 5 (9 th Cir.2000).

Because the SEC can maintain and has alleged here an aiding and abetting claim against Hayes–Bullock, the Court concludes that the test of primary liability should not be so similar to that of secondary liability that the line between primary and secondary liability is blurred. To decide which test to adopt, the Court considers the reach of aiding and abetting liability to actors and the reach to those actors whose conduct might be covered under either of the tests for primary liability. To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3d Cir.1978). The Supreme

Court in *Central Bank* stated that "aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do." *Central Bank,* 511 U.S. at 176, 114 S.Ct. 1439. This description of aiding and abetting liability insinuates that aiding and abetting liability may be broader than even the test suggests. If the Court were to adopt the substantial participation test for primary liability, it is difficult to see what the difference would be between primary liability and aiding and abetting liability for actors who substantially participate in the making of fraudulent statements. On the other hand, as one scholar has recognized, limiting primary liability for company employees under the narrow "bright line" test seems to ignore the reality that actionable misstatements are typically issued in the company's name rather than the name of the officer or director behind such statements. Robert A. Prentice, *Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b),* 75 N.C. L.Rev. 691, 780 n.212 (March 1977). Yet that concern is not so great in the context of an SEC action because an aiding and abetting claim is viable.

The principles for interpreting Section 10(b) and Rule 10b–5 also guide the Court in making its determination. *Central Bank* "emphasized adherence to the statutory language" of Section 10(b) in the context of private suits. *Id.* at 173, 114 S.Ct. 1439. In an action involving the SEC, the Supreme Court observed that while "the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes, generalized references to the remedial purposes of the securities laws will not justify reading a provi-

sion more broadly than its language and the statutory scheme reasonably permit." *Aaron v. S.E.C.*, 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (internal quotations and citations omitted). As to the purpose of the securities laws, the Third Circuit has commented that "[t]he securities laws were intended to provide investors with accurate information and to protect the investing public from the sale of worthless securities through misrepresentations." *U.S. S.E.C. v. Infinity Group Co.*, 212 F.3d 180, 191 (3d Cir.2000) (citing H.R.Rep. No. 85, 73d Cong., 1st Sess., at 1–5 (1933)).

In light of these principles and the SEC's ability to maintain a cause of action for aiding and abetting, this Court concludes that the "bright line" test is the appropriate standard to apply for primary liability under Section 10(b). While this test is more closely aligned with the language of Section 10(b) and Rule 10b–5, thereby limiting the scope of actors who can be primarily liable, the adoption of this test does not mean that those who fall outside this net will escape punishment as the SEC readily can bring an aiding and abetting action against such actors. Not only is this test consistent with the statutory language of Section 10(b), but it more clearly delineates which types of behavior will give rise to primary liability versus secondary liability. The Court also finds unpersuasive the SEC's argument that special consideration should be given to the fact that Hayes–Bullock is not an outside professional but a corporate insider. While it is true that most of the cases dealing with this issue have done so in the context of outsiders such as accountants and lawyers, the *Central Bank* Court did not limit secondary actors to such professionals. 511 U.S. at 191, 114 S.Ct. 1439.

■ Applying the "bright line" test to the allegations here, the SEC's primary liability claim against Hayes–Bullock must fail. There are few factual allegations in the Complaint against her, none of which if proved would satisfy the "bright line" test: She is alleged to have the responsibility for ensuring that the financial statements for transactions occurring within the AT & T customer business unit complied with GAAP; she was made aware of the oral side agreement with AWS; and she drafted or assisted in drafting two letters to the Chief accountant in September 2000 which indicated that there was no such oral side agreement with AWS. These allegations fail to meet the pleading requirements under the "bright line" test for the obvious reason that the misstatement of the $53 million as revenue is not alleged to have been made by Hayes–Bullock and was not directly attributed to her. *See In re Elan Corp.*, 2004 WL 1305845, *26 (S.D.N.Y. May 18, 2004) (finding allegations that auditor implicitly agreed that financial statements conformed with GAAP insufficient under the "bright line" test); *Lawson v. Advanced Equities*, 2003 WL 21468579, *2 (W.D.Ky. June 19, 2003) (allegations that law firms were involved in preparing offering documents were insufficient under the "bright line" test because defendants did not make any of the misstatements themselves); *In re Rent–Way Sec. Litig.*, 209 F.Supp.2d 493, 503 (W.D.Pa.2002) (auditors could not be held liable under "bright line" test for reviewing and approving a company's unaudited quarterly reports); *Winkler v. NRD Min., Ltd.*, 198 F.R.D. 355, 364 (E.D.N.Y.2000) (the "bright line" test was not satisfied when statements made in press release and portion of annual report were not attributed to the defendant director or the defendant public relations firm). Because the Court finds Hayes–Bullock's first argument meritorious, the Court need not reach her other arguments. The primary violation claim against Hayes–Bullock is dismissed.

## B. Count One—Aiding and Abetting Liability

Hayes–Bullock also argues that the aiding and abetting claim embodied in Counts One must be dismissed because the SEC has failed to allege sufficiently any of the requisite elements. The PSLRA explicitly authorizes the SEC to maintain actions for aiding and abetting:

> For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. 78t(e). As stated earlier, to state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir.1978).

██ With regard to the first element, the Court is satisfied that the SEC has sufficiently alleged a primary violation of Section 10(b) and Rule 10b–5 by Lucent. The Complaint alleges that Lucent made a material misrepresentation when it recognized the $53 million as revenue because it overstated pre-tax income by thirteen percent in its 10–Q financial statements for the third quarter of fiscal year 2000. As to arguments that the revenue recognition was not a misstatement because the alleged fraud was based on a future event or because GAAP was not violated, the Court has already addressed these arguments and found them unpersuasive. As to

Hayes–Bullock's argument that the misstatement is not material as a matter of law, the Court is not convinced that the misstatement as alleged would be "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality...." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997). Both parties acknowledge that scienter can only be established for an entity based on the scienter of its agents. And the Court has already determined that the SEC has sufficiently alleged scienter with respect to Carter, thus satisfying its pleading requirements of a primary violation by Lucent.

As to the second element, the parties disagree on whether recklessness will suffice to prove aiding and abetting liability. While Hayes–Bullock contends that only knowledge will suffice, she also argues that the SEC has not pled any allegations that would support either an inference that she knew or was reckless in not knowing that the revenue recognition violated GAAP. The SEC charges that recklessness is sufficient and that this element is supported by the allegations that she was told of the oral side agreement, she was the person responsible for ensuring all transactions complied with GAAP, and she drafted letters to the Chief accountant that were misleading as to the existence of the side agreement. The Court need not decide whether recklessness is sufficient because the SEC's failure to adequately allege when Hayes–Bullock was told of the oral side agreement would cause this claim to fail under either a knowledge or reckless standard. The Court agrees with Hayes–Bullock that the timing of this disclosure is critical because if she were not made aware of the side agreement until after the revenue was recognized, this allegation would be irrelevant. If Hayes–Bullock did not know about the side agreement before

the revenue was recognized, then the SEC could not establish the second element of the aiding and abetting claim. As the Court sees it, this amounts to a failure to plead fraud with particularity and the Court will grant the SEC leave to amend its aiding and abetting claim to include information about when Hayes–Bullock was told about the agreement and what information was disclosed to her.

While the claim cannot stand as is, the Court also considers whether the third element of the claim has been adequately pled. Hayes–Bullock argues that the SEC has failed to allege facts that give rise to a strong inference that she knowingly provided substantial assistance to the primary violator. While whether she "knowingly" or "recklessly" provided such assistance depends on when she was informed of the oral side agreement, if she was informed of the side agreement before the revenue was recognized as of June 30, 2000, the Court is satisfied that the facts as alleged sufficiently plead the element of knowingly providing substantial assistance. As the Court mentioned in its discussion of Carter's scienter, the September 2000 letters, and her part in drafting them, can be circumstantial evidence that she knew it was wrong to recognize the $53 million as revenue. As to her role in recognizing the revenue, the Court can conclude, and it is reasonable to so infer from the allegations, that Hayes–Bullock had an active role in the decision to recognize the $53 million as revenue by virtue of her position and the responsibilities she had as alleged in the Complaint. The Complaint alleges that she was "responsible for ensuring that Lucent's financial statements complied with GAAP for transactions originating within that unit." (Compl. at 64). The Court can infer from this allegation that part of Hayes–Bullock's job entailed reviewing each transaction, including the transaction at issue here, to ensure that it was ac-counted for in accordance with GAAP, and that Hayes–Bullock was familiar with GAAP. The Court cannot think of a better example of substantially assisting another to commit fraud than exists here. If Hayes–Bullock knew of the side agreement, signed-off on the revenue recognition anyway in violation of GAAP, and then assisted in drafting letters to the Chief accountant that suggested that there was no side agreement, this would satisfy the "substantial assistance" element of an aiding and abetting claim. See K & S Partnership v. Continental Bank, N.A. 952 F.2d 971, 979 (8th Cir.1991) (noting that establishing substantial assistance "requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing the tort."). At a minimum, the allegations as to the third element are sufficient to withstand a motion to dismiss.

For the foregoing reasons, the Court dismisses the aiding and abetting claim against Hayes–Bullock without prejudice and grants plaintiff leave to amend the claim to include the missing information, if it can.

### C. Count Three

With respect to Count Three, Hayes–Bullock contends that the SEC has failed to allege with particularity any of the elements necessary to support an aiding and abetting claim. To recap, Count Three alleges that Hayes-bullock aided and abetted Lucent in violating Section 13(a) of the Exchange Act and Rules 12b–20, 13a–11 and 13a–13 by causing Lucent to file materially false and misleading financial statements in a Form 10–Q for the third quarter of its fiscal year 2000. The elements for these aiding and abetting claims are the same as those for a Section 10(b)

claim: (1) a primary violation by Lucent, (2) the aider-abettor had knowledge of that act, and (3) the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen,* 579 F.2d at 799.

■ First, the parties disagree as to whether aiding and abetting claims under Sections 13(a) must be pled with particularity. The SEC references a district court case which held that because scienter is not required to prove a violation of Section 13, *S.E.C. v. McNulty,* 137 F.3d 732, 741 (2d Cir.1998), the heightened pleading requirement of Rule 9(b) does not apply to such claims. *S.E.C. v. System Software Associates, Inc.,* 145 F.Supp.2d 954, 958 (N.D.Ill.2001). Hayes–Bullock counters with a Third Circuit case which held that Rule 9(b) applies to a securities law claim that "sounds in fraud." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 287–88 (3d Cir.1992) (holding that when Section 11 and 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies). In *Shapiro,* the Court examined the factual allegations in support of the Sections 11 and 12(2) claims and found that they referred to the prospectus at issue as false and misleading and repeatedly aver that the defendants "intentionally," "knowingly," or "recklessly" misrepresented information. *Id.* at 287. The allegations supporting Count Three here also sound in fraud. Count Three alleges that Hayes–Bullock caused Lucent to file materially false and misleading financial statements and that she knowingly provided substantial assistance to Lucent in violating Section 13(a), Rules 12b–20, 13a–11 and 13a–13. (Compl. at 97–99). The Complaint does not allege any facts to support this claim other than those that support the Section 10(b) claims against Hayes–Bullock. While a Section 13 claim does not require a showing of scienter, that the SEC has pled that Hayes–Bullock

knowingly assisted Lucent's violation of Section 13 leads this Court to conclude that the particularity requirement of Rule 9(b) should apply to this claim as well.

Hayes–Bullock first argues that the Complaint fails to sufficiently allege a primary violation by Lucent for the same reasons she argued that this element was not alleged with respect to the Section 10(b) claim—the alleged fraud was based on a future event and the revenue recognition did not violate GAAP. The Court has already addressed these unpersuasive arguments. Her second argument is that the allegations are insufficient to establish that she knew it was improper to recognize the $53 million as revenue. For the same reasons the Court dismissed the SEC's aiding and abetting claim for failure to plead facts in support of the second element with particularity, the Court dismisses Count Three of the Complaint without prejudice and grants plaintiff leave to amend.

### D. Count Four

Count Four alleges that Hayes–Bullock aided and abetted Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Four also alleges that Hayes–Bullock knowingly provided substantial assistance to Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B). For the same reasons articulated in the previous section, the particularity requirement of Rule 9(b) applies to this claim.

Hayes–Bullock again argues that the SEC has failed to allege with particularity any of the elements necessary to support an aiding and abetting claim. For the same reasons the Court dismissed the SEC's aiding and abetting claim for failure

to plead facts in support of the second element with particularity, the Court dismisses Count Four of the Complaint without prejudice and grants plaintiff leave to amend.

### E. Count Five

Count Five alleges that Hayes–Bullock "knowingly circumvented Lucent's system of internal accounting controls and ... knowingly falsified, or caused to be falsified, Lucent's books and records," in violation of Section 13(b)(5) and Rule 13b2–1. While Hayes–Bullock makes a number of arguments why this claim should be dismissed, the Court dismisses this claim for the same reason it dismissed all the aiding and abetting claims—the SEC has failed to allege when Hayes–Bullock learned of the side agreement. Because the SEC has failed to plead with particularity the facts that may give rise to a strong inference that Hayes–Bullock knowingly falsified or knowingly caused such books and records to be falsified, this claim is dismissed without prejudice with leave to plaintiff to amend the Complaint.

In sum, Hayes–Bullock's motion to dismiss is granted and the SEC is granted leave to amend the Complaint's aiding and abetting liability portions of the First, Third, Fourth and Fifth Claims.

### CONCLUSION

Carter's motion to dismiss the Complaint is DENIED, Hayes–Bullock's motion to dismiss the primary liability claim in First Count of the Complaint is GRANTED with prejudice, and Hayes–Bullock's motion to dismiss the remaining claims and counts of the Complaint is GRANTED without prejudice and Plaintiff is GRANTED leave to amend the Complaint.

### ORDER

It is on this 6th day of April 2005:

ORDERED that Defendant Jay Carter's motion to dismiss the Complaint is DENIED, Defendant Michelle Hayes–Bullock's motion to dismiss the primary liability claim in First Count of the Complaint is GRANTED with prejudice, and Defendant Michelle Hayes–Bullock's motion to dismiss the remaining claims and counts of the Complaint is GRANTED without prejudice and Plaintiff is GRANTED leave to amend the Complaint.